Mr. Justice WAYNE,
 

 having stated the pleadings, delivered the opinion of the court:
 

 • This cause has been argued with ability, and we are brought to the consideration of it with every advantage, in -any way applicable to the rights of the parties in a court of equity, by the written opinion of our brother who tried it, and gave the decree in the Circuit Court.
 

 The allegation is that the purchase made by the Leonards of the Botch heirs was in behalf and for the benefit of the Tobeys, and that the conveyances by the Tobeys were made as security for the payment by them of the notes for twenty-five hundred dollars, given to the Notch heirs. This is the issue between the parties, and the question is which of them is sustained by the proofs.
 

 
 *430
 

 “
 
 Denials in answer to a bill in equity to tbe extent of their relation to facts witliin the knowledge of the respondent, when they are responsive to the allegations of the bill of complaint, must be received as evidence. Courts of equity cannot decree against such denials in the answer of the respondent on the testimony of a single witness. On the contrary, the rule is universal, under such circumstances, that the complainant must have two witnesses, or one witness and corroborative circumstances, or he is not entitled to relief. Thel rule stands upon the reason, that when a complainant calls upon the respondent to answer allegations, he admits the answer to be evidence; and if it is testimony in the case, it is equal to the testimony of any other wTitnesses, and the complainant cannot prevail if the balance of proof is not in his favor; he must have circumstances in addition to his single witness in order to turn the balance.”
 
 *
 

 This, no doubt, is the general rule of chancery;
 
 †
 
 hut it is one which does not, in the present case, apply, for here
 
 seven
 
 unimpeached witnesses state that in business interviews either with Horatio or Nehemiah Leonard, in relation to their purchase of the homestead farm, or to matters in some way connected with it, the defendants, one or the other of them, said, in language which could not be mistaken, that the purchase of the Notch mortgage had been made to assist Jonathan Tobey to pay the debt due upon it.
 
 We
 
 proceed to state this testimony, and the impressions made upon us by it..
 

 Horatio Leonard said to the witness
 
 Jones Robinson,
 
 that he himself and his father had given a note for it payable in a year for $2500, and that the complainant and his father must get the wood oif to meet it, and that he only wanted them to pay the note and to pay himself for his trouble-; and added it was to be paid for from the wood, and if there was not enough, that he should sell some of the real estate.
 

 
 *431
 
 Another witness,
 
 Edward Chase,
 
 swears that Horatio Leonard said to him, after relating the circumstances of the purchase of the Notch mortgage, in connection with the impoverished condition of the Tobeys, that he had taken hold to help them.
 

 George
 
 Bamey, a third witness, says that he had a conversation with Horatio Leonard; that he mentioned that he had purchased the farm formerly owned by Jonathan Tobey, &e., with an intention
 
 to sell it hack to the owner;
 
 that he had done so to prevent it from going into the hands of strangers, and to keep a home for the old people, and
 
 that he was to be repaid
 
 the money spent in purchasing the farm.
 

 Sampson Reynolds,
 
 a fourth witness, swears, that Nehemiah Leonard said to him that his son had married Jonathan Tobey’s daughter, and that, he had a notion to take up the Notch mortgage, cutting and selling wood enough to pay off the debt, and letting the old man have a home there as long as ho lived.
 

 Áldcn Lawrence,
 
 a fifth, testifies that Nehemiah Leonard said to him, that he had taken the property for the accommodation of the old gentleman, as he was liable to be turned out of house and home at any time; took it to preserve a home for the old folks; and the witness understood him to say “ that he calculated to take the wood, and would then turn the property back.”
 

 Leonard Tobey,
 
 the brother of the complainant, and a sixth witness, deposes that he called upon Nehemiah Leonard, who, after expressing his regret that there should be a misunderstanding between his son Horatio and Jonathan Tobey, said, in substance, that he would use his influence to get Horatio to convey .the mortgage to his father and brother, and that he was willing to give up the place if the money was refunded. He also said that' J onathan Tobey came to him as a last resort; that the arrangement was that Horatio should see that wood enough was cut to meet the notes at maturity. ^
 

 William Tobey,
 
 the seventh witness, testifies that he was intimately acquainted with Horatio Leonard for seven years,
 
 *432
 
 including the year 1859, and that be called upon Mm at bis place of business in Boston in reference to tbe matter, .and said be bad made a proposition to Stephen Tobey, that himself and Stephen should buy the claim of the Botch heirs; Stephen to put in his
 
 claim;
 
 that they should be interested and improve the farm and occupy it together; and that, if Stephen should die
 
 without heirs, his interest should he willed to the children of Horatio.
 
 Pie added, that Stephen would not agree to it, and seemed to have a feeling that it was meant to take advantage of him. “ He expressed the wish that I would go to New Bedford and bring about the arrangement, saying that he would pay my expenses. He said his motives were pure, that he did not know it would be of any use to him, but thought it would be to his children; that it would be a good home for Stephen, and his father and mother, and that he wanted the farm to remain in the family.” In reply to one interrogatory, the witness answered, that, after speaking of other matters relating to the purchase of the farm, Nehemiah Leonard added, that he had at first refused to assist in raising the money to buy it; that he had finally agreed to it from the friendly feeling he had for the Tobeys, and his only object for complying with their wishes and his son’s request was to benefit the family. He also said that Jonathan Tobey came to him as a last resort, and that the arrangement was that Horatio should see that wood enough was cut to meet the notes at maturity.
 

 The testimony of the preceding seven witnesses must be considered, in connection with that of Jonathan Tobey, who had sold out all his interest in the property to his son, the complainant, to
 
 enable himself to be a witness upon the trial of the cause.
 

 Óur first remark is, that such a sale for such a purpose is allowable, and that its lawfulness has' been sanctioned by this court
 
 *
 
 even when the sale was to a party who had no previous interest: We say next that the attempt by the-
 
 *433
 
 defendants to discredit Jonathan Tobey as a man of truth is a failure, in fact, from all that the witnesses, introduced for such purpose, had said or could, say about him, and that all that they did say has been rebutted by the evidence of witnesses more numerous than the former and as respectable. Some of them had known Tobey for years in the social relations of his life and in his public business; all of them swore without any qualification that they believe him to be a correct man, and that they would believe him upon his oath. No point of his testimony in this ease is contradicted by any witness, and all that he has said is in harmony with the motive which could only have induced him to place himself in a position to aid in the restoration of his son to his rights, to whom he owed a debt of six thousand dollars with long years of interest, against the contrivance of a son-in-law to whom he owed nothing; and who had succeeded in getting all of the estate of both for a very insufficient consideration, without the payment of a cent in fact. Tobey’s statement of his agreement with the Leonards to give them a quit-claim for his entire estate, has not been disproved either directly or inferentially by circumstances or by any witness, and has only been denied by the defendants in theii answers. He has neither qualified nor modified the facts to which he has sworn in Iris replies to the questions put to him in behalf of the complainant, or to such a"s were asked by the defendants. His answers as to the lands which he owned, besides those included in the Notch mortgage, correspond with the subsequent surveys with as much exactness as the circumstances of his manner of acquiring them permitted. It is appropriate to say that his'account is not contradicted in the answers of the defendants to the bill, excepting the effort made by them to enlarge the quantity of the real estate to be attached to the homestead farm, contrary to its boundaries, as it had been conveyed to Horatio Leonard by the Notch heirs. Tobey’s narrative of his connection with William Notch, how he became indebted to him for his advances of money to construct a county road which Mr. Notch wanted, to be made, to give him a shorter and better route frotia his.
 
 *434
 
 place to Boston, of Mr. Notch’s offers to advance him money as he might need it, if he would undertake the construction of the road, and after he had completed it of the litigation for the sum due to him under the contract, and of his losses in consequence, are all substantiated by documents which show plainly the causes of his pecuniary embarrassments, .and of some of his peculiarities in litigation during a long life, and up to the time when, as Nehemiah Leonard has said, “ he came to me as a last-resort to get his aid to purchase the Notch mortgage.”
 

 The testimony of such a witness as Jonathan Tobey is to he scrutinized, no doubt, carefully and with great caution,/ perhaps with suspicion, before it can be allowed to invalidate ' the denials of respondents of the allegations of a bill inequity. But we have thus faithfully scrutinized it in this instance, in connection with all the testimony introduced by the defendants, and without any impression having been made upon us that Jonathan Tobey had not told the truth in regard to this transaction.
 

 The witness who is most relied upon by the defendants to prove that there had been no stipulation for a bond or written instrument between the parties for a reconveyance of the-property to Jonathan Tobey, is T. M. Stetson, Esq., who had been the counsel of Tobey from February, 1858, to December, 1859.
 

 Eairér or more proper testimony, indeed, than that of this gentleman could not have been given. It is marked by forbearance and caution; but, in our opinion, it does not disprove that there had been a private arrangement between the parties for a reconveyance of the property to the complainant and his father, when the notes given for the Notch farm should have been provided' for or were paid. Mr. Stetson says that he-told Jonathan Tobey and the complainant that he could make no defence in the ejectment suit pending against the plaintiff’s title and evidence, and that it had been delayed by Iris suggestion that' it might be -settled. 'That afterwards he met Hotatio Leonard, whom
 
 *435
 
 he supposed to be a man of means, and told him he thought he could make it an object to buy the property from the agent of the Notch heirs. Ho refused, on account of there having been so many conveyances about the property, and on account of 'the weibknown character of Jonathan Tobey for litigation; but he said if he could have the
 
 whole property without any question or lawsuit,
 
 that he did not know but that he •would take it; but that he must have
 
 the whole or none.
 
 The witness told this to Mr. Tobey. “We talked over the position of the suitj” says Mr. Stetson, “ and Mr. Tobey said that he might as well discontinue his defence. This I told to Horatio Leonard. A few days after, Jonathan Tobey, Stephen Tobey and Horatio Leonard .came into my office. Horatio said he had seen the agent for the Notch heirs, and had learned their price. He said he was not going to get into a lawsuit, and would not buy unless he could get a clear and good title. ' He also asked me if I considered the Notch title such a one. I said that I did, with the evidence which they had, but that of course it was better to get releases*and quit-claims from every one who thought he had any interest in the property. I then stated that I thought the better way for Leonard to get the whole title was to have the Notch suit perfected by a judgment and execution levied. Leonard then said that was what he wanted and must have. Jonathan Tobey seemed to wish Leonard to become the owner of the property, and executed his quit-claim for it. Stephen Tobey, after some conversation, executed his release, both being done before the witnessi” The papers had been drawn by Mr. Stetson before the meeting, at his office, and we understand him to' say that he does not recollect by whom he .was directed .to draw them. We also understand him to say that he knew nothing of any private arrangement between-the parties for a reconveyance of the property to the Tobeys before or after the quit-claim deeds were given in his office. In fact, Mr. Stetson confines himself to what occurred and was said there, without alluding to any conversation they may have had elsewhere, leaving the fact of an understanding for a reconveyance to the testimony in the
 
 *436
 
 case as that might be. In our view it is not at all likely that such an arrangement would have been mentioned to him by either party, before or when he was advising as counsel, or as the friend or agent of all of them, how a title to the property could be perfected. Such a device to defeat it as that one party was to have a right to a reconveyance of the''property, upon paying the notes with interest, which had been given in payment for the Rotch mortgage, and that' Horatio Leonard was to have a title in paper to the homestead farm, and all the real estate besides, with all the advantages of using both for his awn benefit, with a secret condition to relinquish and reconvej* to the Tobeys, would probably have been met by Mr. Steíáon with a suggestion that a condition of that kind, under all the circumstances and his position then, would not be consistent with the ethics of his profession, the law requiring as a fairer mode in such a case, that such' a condition should be a part of the deed, or if it ■was to operate as-a defeasance, that it must be
 
 “
 
 made
 
 eodem
 
 modo, as the thing to be defeated was created.”
 
 *
 

 We conclude that the testimony and corroborating circumstances resulting from it, with other proofs in the record,' overrule the denials by the defendants of the allegations.
 

 One of these corroborative proofs is t-lie fact, that after the Leonards had ascertained that the Rotch mortgage could be bought for twenty-five hundred dollars upon time, and had actually bargained with the Rotch heirs for the purchase of it, according to the described boundaries and contents of the homestead as set out in the suit to eject Jonathan Tobey, and ascertained that ho was the owner of other real estate not a part of it, and that all of the real "estate had been mortgaged to the complainant, — Horatio Leonard, under such circumstances, should have pretended and represented to Jonathan Tobey and his wife that a quit-claim for thé property, with his wife’s relinquishment of dower, was necessary to give him a clear title to enable him to borrow money upon it; and should then have stated to the Tobeys that he
 
 *437
 
 must have conveyances for all of the real estate, as a prerequisite, before be would buy tbe Notch mortgage, being then the purchaser of it, with arrangements then going on for him to secure from the heirs of Notch their title. We think that such a condition was a menace, made at a time when the Tobeys were helpless and deprived of all hope of getting relief; and that Horatio Leonard must have known its effect would be to coerce them to compliance with his terms. Under the circumstances, as they are detailed in the answer of Horatio Leonard, we view it as a contrivance to vest in himself the whole property, under the guise of buying the Notch mortgage for the benefit of Jonathan Tobey. ' It is difficult, too, for us to credit the narrative of Horatio Leonard, that an old man, with an aged wife, pressed by embarrassment and distress, as he then was, should have been willing to divest himself of everything that he owned, without the reservation of something to live upon, and somewhere to live, and-all this with the view of giving everything that he had in the world to a son-in-law, to keep the homestead in the latter’s family, to the exclusion not only of himself and wife, but all his other children, and particularly pa of his son, the. complainant, to whom he owed at" that time six thousand dollars, with long years of interest, and who had been for many years the stay and support of his father and mother. And this aspect of the case, as to the arrangement for a reconveyance of the property to the Tobeys, when Horatio Leonard demanded titles to the whole of the property, is much strengthened by the fact that Horatio Leonard, after having got a title to’ the homestead farm, and conveyances for everything that the Tobeys had, became so restless concerning the. lawfulness of his right to the property, that’ he made a virtual acknowledgment of Jonathan Tobey’s interest in it, by asking the old man to make a will in his favor, and actually employed counsel to draw it, and that without having previously mentioned his -intention to Mr. Tobey. Mr. Stetson mentions the fact in his testimony, and the accidental cause of its having been defeated.
 

 We have carefully examined and considered the whole
 
 *438
 
 testimony given by the defendants in the case, but it is without weight sufficient to counterpoise the conclusion to which we tend.
 

 Nor is it inappropriate for us to say, concerning much of the testimony introduced by Horatio Leonard, that, when the father of a family introduces the juvenile members of it as witnesses in such a litigation as
 
 this
 
 has been, it cannot be done without its being considered as a forlorn effort of parental obliquity.
 

 As a result, we concur in the opinion, — That it has been established by the proofs in this case, as the rules of evidence require the denials of the allegations in a bill of équity to be disproved, that the payment made by Nehemiah Leonard and Horatio Leonard, for the purchase of the homestead .farm was intended by them to be an advance of money for the benefit of Jonathan Tobey : That the conveyances executed by Jonathan Tobey and his wife to Horatio Leonard, and the release given by the complainant to him, of all his interest in the real estate purporting to have been conveyed by them, were intended by the parties to them, and were so received by Horatio Leonard, as securities for the repayment of the notes with interest, for twenty-five hundred dollars paid by Nehemiah and Horatio Leonard to the heirs of Notch for tire homestead farm, and that’ the defendant, Horatio Leonard, agreed to reconvey the real estate property attached to it, and all the rest of the real estate conveyed to him, when payment should be made of-the sum of money advanced by the Leonards for the benefit of Jonathan Tobey, and such reásonable compensation as might be claimed by them for their agency and aid_in _the transaction. "We are also of opinion, — when the "complainant tendered to-Nehemiah Leonard the sum necessary to pay the notes with interest, which had been given to the. Notch hejrs, at the same’time asking for a reconveyance of the propérty,' — that he was entitled to it, and that i,t should have been made, and that the subsequent sale of it, as it was made, was in fraud of the complainant’s rights.
 

 
 *439
 
 We have carefully considered the answers of E. and J. and E. Ashley, Spoóner, and Hawes, to the allegations of the complainant’s bill. Notwithstanding their denials of them, their narratives in each of their answers of their purchases of parcels of the real estate in controversy, connected with the testimony, establish the fact, that when they respectively made their purchases of the real estate from Nehemiah Leonard, or from the Ashleys, that each of them had such notice of the rights claimed to all of the real estate by the complainant, and of what had been the rights to it by Jonathan Tobey before he made a sale , of it to the complainant, and that neither of them can be protected in a court of equity, as having been
 
 bond fide
 
 purchasers without notice.
 

 Our attention has also been given to the supplemental answers of the defendants to the bill of the complainant, relating to a conditional conveyance by Jonathan Tobey, of real estate in the County of Bristol, to secure Clapp from any liability he might incur by indorsing Tobey’s paper, and Tobey’s release of his interest and transfer of all his rights in a conveyance to the Wareham Bank. In our opinion, this interposes- no obstacle to rendering a decree for the complainant.
 

 From the opinion which we have above expressed of the character of the transaction betweén the Leonards and the Tobeys, it becomes unnecessary for us to discuss the point made by all of the defendants in the cause, that they were not liable to the complainant, as the statute of Massachusetts had declared that no action shall be brought upon any sale of lands, tenements, or hereditaments, or of any interest in or concerning them, unless the promise, contract, or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the judge charged therewith, or by some person by him lawfully authorized.
 

 Decree reversed, and the defendants ordered to reeonvey to the complainant all the real and personal estate (Ashleys,
 
 *440
 
 Spooner, and Hawes, to join in the conveyance of the real), on repayment of the |2500, with interest, 'deducting $840, with interest, received by the defendant, Horatio, for wood standing on the land.and sold. The cause remanded, with 'directions to proceed accordingly.
 

 GRIER and CLIFFORD, JJ., dissented.
 

 *
 

 Opinion in this case on the circuit per Clifford, J. See, also, Clarke
 
 v.
 
 Van Tiersdyke, 9 Cranch, 160; Hughes
 
 v.
 
 Blake, 6 Wheaton, 468; cited by the learned justice.
 

 †
 

 Parker
 
 v.
 
 Phetteplace, 1 Wallace, 684.
 

 *
 

 Babcock
 
 v.
 
 Wyman, 19 Howard, 289.
 

 *
 

 Shepherd’s Touchstone, 390.