## SEELEY *v.* REED.[1]

*(Circuit Court, D. Oregon.* November 2, 1885.)

**1. SUIT TO RESCIND CONTRACT ON THE GROUND OF FRAUD.**

A court of equity will decree a rescission of a contract obtained by the fraudulent representations or conduct of one of the parties thereto, on the complaint of the other, when it satisfactorily appears that the party seeking the rescission has been misled in regard to a material matter by such representation or conduct, to his injury or prejudice.

**2. SAME—MISTAKE.**

But when the facts are known to both parties, and each acts on his own judgment, the court will not rescind the contract because it may or does turn out that they, or either of them, were mistaken as to the legal effect of the facts, or the rights or obligations of the parties thereunder; and particularly when such mistake can in no way injuriously affect the right of the party complaining under the contract, or prevent him from obtaining and receiving all the benefit contemplated by it, and to which he is entitled under it.

Suit to Rescind Contract.

*Thomas N. Strong,* for plaintiff.

*George H. Williams* and *George H. Durham,* for defendant.

DEADY, J. This suit is brought by the plaintiff, a citizen of Ohio, against the defendant, a citizen of Oregon, to have a contract entered into by the parties on March 27, 1884, canceled, and a certain promissory note and certificate of stock then delivered by Seeley to Reed in pursuance thereof, returned to him. The bill was filed July 29, 1884. The case was heard and submitted on the bill, answer, and replication, and the testimony taken by the plaintiff. The execution of the contract in question is admitted. At the date of it the parties were in New York, and the plaintiff was a stockholder in the Oregon Iron & Steel Company, a corporation formed under the laws of Oregon, of which the defendant was then the president. It begins with a recital that Reed is willing "to advance or loan" said company, including the amount theretofore "loaned or advanced" to it, the sum of $150,000; that Seeley "is willing and desires to obtain an interest of $50,000" in said loan, and to that end has given his note for that sum to Reed, payable in two years thereafter, with interest at 7 per centum per annum, and "delivered, as collateral security for said note and the interest thereon, 361 shares of the capital stock, full paid," of said company; in consideration whereof Reed agrees, on the payment of said note, to redeliver to Seeley said shares of stock, "together with one-third of such bonds, stocks, notes, or other securities" as he may obtain from said company, "in consideration of his said advance of $150,000;" and Seeley authorizes Reed in default of payment of said note "to sell or dispose" of said 361 shares of stock, and the said one-third of the securities received from said company, subject, however, to the stipulation that if the proceeds of such sale or disposition are not sufficient to pay said note at the ma-

[1] See note at end of case.

turity thereof, Seeley shall not be further liable thereon, but the same shall be delivered to him; and in consideration of the premises Seeley also agrees, if requested by said company, to act as its general manager for the period of two years, at a salary not exceeding $3,000 per annum.

The bill alleges that on August 22, 1883, the capital stock of the company was reduced from $3,000,000 to $1,500,000, and the number of shares thereof reduced correspondingly, but Seeley's certificate No. 10, for 722 shares, was not surrendered and reduced to 361 shares, of which it is, and in making said contract was considered, the equivalent; that at the date of the contract the company was financially embarrassed, and the same was executed solely for the purpose of aiding it in raising funds; that Seeley had not been in Oregon for a long time, and got "almost all" his information concerning the condition of the company from Reed, who "falsely and fraudulently represented" to him that he had advanced over $100,000 to the company, when in fact he was then, and still is, largely indebted thereto; that said certificate was delivered to Reed in trust until he should make the loan to the company and obtain the securities therefor, when it was to be held as collateral security for the payment of the note, which latter was delivered without any consideration except the contract; that shortly after Seeley arrived in Oregon, on and after July 10, 1884, he first examined the records of the company and discovered that Reed and his associates, "fraudulently contriving" "to wreck" said company, had "fraudulently and illegally appropriated and converted to their own use over $400,000 in money and properties of its assets;" whereupon he commenced a suit in this court against Reed and others, comprising the firm of Smith Bros. & Watson, and W. S. Ladd and others, comprising the firm of Ladd & Tilton, and E. W. Crichton, C. R. Donahue, and H. A. Elliott, to compel the return to the company of said assets, which suit, the bill therein being held multifarious, was on November 12th dismissed, when he commenced two suits in this court for the same matters, the one against a portion of said parties and the other against them all, which suits are still pending, and Seeley's right to maintain them depends on his being a stockholder of said company; that on July —, 1884, and divers days thereafter, Seeley demanded of Reed to return said certificate and note or perform his agreement and advance $150,-000 to the company, the former of which he refused and still refuses to do, and the latter of which he is now unable to do, and "is fraudulently attempting to make said company insolvent and financially embarrassed and unable to pay its debts;" that said 361 shares of stock have not been transferred on the books of the company, and the legal title thereto is still in Seeley, but that on July 16, 1884, and since, Reed, to prevent Seeley from maintaining said suits, and to enable him the better to carry out his scheme of wrecking said company, did fill up said blank transfer and power, and attempt to have said shares

of stock transferred to himself, and unless restrained will yet do so, for he and his associates have the control of said company, to the "irreparable injury" of the plaintiff and said company, and "to the manifest and irreparable subversion of justice in the premises."

The defendant, by his answer, denies positively and specifically every charge in the bill of false, fraudulent, or illegal purpose, representation, or conduct, or that he is or ever was indebted to the company, and alleges that at and prior to the date of said contract Seeley and himself were in New York conferring together concerning the financial troubles of the company with a view to its relief, at which time the latter knew that the defendant had advanced in the neighborhood of $100,000 to the company and was fully advised of the proceedings of the directors; that Seeley then knew the financial condition of the company otherwise than from the defendant, and was in close relationship and correspondence with E. W. Crichton, the secretary and one of the directors of the company; that Seeley then and there proposed that if the defendant would buy of him 62½ of the reduced shares of the company's stock at its par value, $6,250, and would enter into said contract and take his non-negotiable note and said 361 shares of stock as collateral security for its payment, he would come out to Oregon and attend to the business of said company and relieve the defendant from further anxiety about the same; that Seeley, who was much better acquainted with said business than the defendant, represented to him that if this arrangement was made he could put the business of the company on a satisfactory footing, whereupon the defendant accepted the same and signed said agreement and at this same time, and as a part of the same transaction, and to accommodate Seeley, he purchased from him said 62½ shares of stock, and then and there paid for them, by cash, $4,090, and by the surrender of Seeley's note of May 21, 1883, for $2,000, with interest from date at 8 per centum, making in all $6,250; that thereupon Seeley delivered to defendant certificate No. 22 for 125 shares of stock, with an indorsement thereon dated March 27, 1884, signed by him, and to the effect that it was to be surrendered and a new certificate issue in its place for half the amount, together with a power of attorney for the transfer of the same, and on April 8, 1884, delivered to the defendant certificate No. 10 for 722 shares of the company's stock, mentioned as 361 shares of said stock in said contract, with a like power of attorney and indorsement thereon; that defendant did not want said 62½ shares of stock, nor were they worth the price paid for them, and the chief inducement for their purchase was to get Seeley to come out to Oregon and take charge of the company's business, for which reason, at the latter's urgent request, he also, on April 10th, advanced him $500 to defray his expenses to Oregon; that soon after, Seeley came to Oregon, arriving in Portland on April 17th, for the purpose, as defendant understood, of carrying out said contract, but instead of so doing, returned to New York about June 10th, and

proposed to the defendant that he should acquire the property of the company and convey one-fourth thereof to himself, one-sixth to Crichton, and one-twelfth to Donahue, with the management of the whole, for which Seeley was to give his note for $150,000, payable in 30 years, with interest at 6 per centum per annum, and said Crichton and Donahue were to give similar notes for $100,000 and $50,000 respectively, to be secured by a mortgage on the property, and that this proposition was accompanied with a threat that unless it was accepted, Seeley would sue the defendant, exhibiting at the same time an opinion prepared by his counsel, in which it was said; "In the hands of a skillful lawyer their mistakes, [referring to the directors of the company,] however innocent they might have been, would appear very suspicious, and the wreck of this fine property appear a premeditated affair,"—which proposition the defendant declined, and insisted on the arrangement of March 27, 1884; that about June 16th the defendant, in pursuance of said contract, advanced the company $30,000; that defendant arrived in Portland about June 30th, and on July 7th proposed to the company to make it an advance sufficient, with that already advanced, to make the sum of $150,000, which proposition, by the votes of Crichton and Donahue, who were then in the board of directors, was laid on the table, but was repeated on September 23d, and laid on the table until October 21st, when it was duly accepted, and thereafter, on October 23d, the defendant, in pursuance thereof, advanced and loaned to the company $20,847.91, which, with his former loans and advances, made the sum of $150,-000; and that the blank assignment and power given to the defendant by Seeley, with the certificate No. 10, was filled up by the former in the due course of business before the commencement of the suit by Seeley against Reed and others, and according to the understanding with Seeley at the date of the contract; but the secretary of the company, Crichton, acting in collusion with Seeley, illegally refused to make the transfer to the defendant on the books of the company.

The defendant, also, in his answer, offers to rescind the contract and return the note and both the stock certificates if Seeley will return him the money paid on No. 22,—$6,250,—which he avers was a part of the consideration of the contract.

The testimony taken by the plaintiff was quite voluminous and covers a wide range. By far the greater portion of it relates to matters mooted in the other suits of his pending in this court, and have little or no application or weight in this.

The answer of the defendant is under oath, and so far as it is responsive to the bill it is taken as true until the contrary is clearly established by the testimony of at least two witnesses, or one witness and clear, corroborating circumstances. *Hough* v. *Richardson*, 3 Story, 692; Story, Eq. Pl. § 875a; *Tobey* v. *Leonards*, 2 Wall. 423.

The only ground on which the court can give the relief prayed for in this bill is that, by the fraudulent representation or conduct of the

defendant in or about a matter material to the subject of this contract, the plaintiff was misled to his injury. Story, Eq. Jur. §§ 201, 202, 695; 2 Pom. Eq. Jur. § 910; *Hough* v. *Richardson*, 3 Story, 690; *Smith* v. *Richards*, 13 Pet. 36.

The allegations of fraud are vague and indefinite. They may be condensed into two statements. One, that the defendant, at the time of making the contract, told the plaintiff that the company owed him about $100,000, when in fact he was indebted to it. The other, that sometime before that date the defendant and his associates, without saying who they are, had fraudulently appropriated to their own use $400,000 of the assets of the company. The only evidence in support of the first allegation is the testimony of the plaintiff, which is contradicted by the answer of the defendant.

Looking into the evidence to see on what this question of indebtedness turns, I find that the company was organized in April, 1882, with 18,000 shares of stock of the par value of $100 each, which was subscribed by W. S. Ladd, W. M. Ladd, and E. W. Crichton, the latter taking 17,700, and the others 150 shares each; that in the fall of 1882 the company purchased the property of the Oswego Iron-works, valued at $600,000, for 12,000 shares of its stock, valued at 50 cents on the dollar, and issued the same to S. G. Reed, H. Villard, and D. O. Mills, 3,000 shares each, and to W. S. Ladd, L. B. Seeley, C. P. Donahue, and E. W. Crichton 750 shares each; that soon after the remaining 6,000 shares were issued to Crichton as paid-up stock, to be disposed of as such at 50 cents on the dollar, for the purpose of purchasing machinery for the company, which stock Crichton soon after surrendered, and the same was reissued to the defendant for that same purpose, and that he disposed of one-half of said shares for the sum of $150,000, for which he accounted to the company, but being unable to dispose of the remainder, he returned them to the company, when the directors, at a meeting held on September 24, 1883, accepted the same, and returned his receipt therefor, and at the same time, in pursuance of a vote of the stockholders, at a meeting thereof held on the same day, the directors reduced the stock of the company one-half, and ordered the unsold shares returned by the defendant cancelled; and that the defendant, prior to the making of said contract, had in fact advanced to the company near about $100,000.

It also appears from the testimony of the plaintiff, as well as otherwise, that all these matters were known to him at and before the making of the contract, and that he and the defendant acted on the assumption that such were the facts, without either relying on the other for his information; but afterwards, and before commencing this suit, the plaintiff, on the advice of counsel probably, came to the conclusion that the legal effect of the facts was and is that the defendant was a subscriber for said 6,000 shares of stock, and not the mere agent of the company for its disposal, and therefore was still indebted thereon to the company in the sum of $150,000, from which

the directors had no power or right to release him, and that, deducting his advance from this sum, he remained and was indebted to the company in the sum of $50,000.

Now, admitting that the plaintiff's present view of the defendant's liability in regard to this stock is the correct one, there is no ground for saying that the plaintiff was misled in this matter by the defendant. The plaintiff knew as well as the defendant that the directors had accepted the return by the latter of the 3,000 shares of this stock, and the facts relating to it, and could and did judge for himself as to the effect thereof. At least the defendant does not appear to have been either his informer or adviser in the premises, while he does appear to have been in close correspondence with his friend E. W. Crichton, who has been a director and superintendent of the company since its formation, and the secretary thereof since December 1, 1883. But, admitting that the defendant was indebted to the company in the sum of $50,000, instead of the company being indebted to him in the sum of $100,000, and that the plaintiff was ignorant of that fact, the knowledge of it would not have prevented him from entering into this contract, but, on the contrary, would have been an additional inducement to do so. In this matter the defendant appears to have sought and obtained an opportunity to take an interest with the defendant in a loan to the company, not simply for the good of the latter, so far as appears, but his own good as well. The state of the account between the company and the defendant was a matter of no importance in the premises to the plaintiff, except as it indicated the solvency or not of the former and its ability to repay the loan with interest. So that, the defendant being abundantly able to pay this supposed indebtedness to the company, the fact of its existence, instead of operating as a fraud on the plaintiff as a party to to this contract, was an advantage to him, both as a creditor and a stockholder, to the extent that it increased the company's assets.

As to the other charge, the material facts appear to be that in the spring of 1883 negotiations were opened between the company and the firm of Smith Bros. & Watson, of this city, for the purchase of their foundry property, that resulted in a proposition by the latter to sell the same, at a valuation of $225,000, for 4,500 shares of the company's stock, valued at 50 cents on the dollar, and, at a stockholders' meeting held on March 20, 1883, it was voted to authorize the directors to make the purchase, and upon the receipt of proper deeds and bills of sale of said property, to issue to Smith Bros. & Watson 4,500 shares of paid-up stock of the company; but the directors took no action in the premises, nor did the former ever make any conveyance or transfer of their property to the company. Subsequently they proposed to withdraw their proposition of sale, and at a meeting of the directors held on September 24, 1883, their request was unanimously complied with. In the mean time, between the making of the proposition and the withdrawal of the same, the two concerns maintained

intimate business relations, but were carried on separately and without any consolidation. In this time Smith Bros. & Watson put up the large iron transfer or ferry boat for the Northern Pacific, to be used on the Columbia river, at Kalama, by which it is said they cleared $100,000, and did work for the company for which they were allowed and paid on settlement $40,000.

The charge that the defendant and his "associates," meaning, I suppose, his co-directors, W. M. Ladd, E. W. Crichton, C. R. Donahue, and F. C. Smith, the persons constituting the board when Smith Bros. & Watson were allowed to withdraw, appropriated $400,000 of the assets of the company to their own use, is based on these facts. In other words, it is boldly assumed that the company not only lost the value of the foundry property, the alleged profits of the transfer-boat construction, and the money paid for work done for it, in all $365,000, by the illegal action of the defendant and his co-directors on September 24th, but that these parties thereby wrongfully appropriated the same to their own use. To begin with, the company could not have lost anything by not getting the foundry property, unless it was worth more than it was to give for it, which does not appear, and that it could possibly have lost $225,000 thereby, or any considerable portion of that sum, is, under the circumstances, simply absurd.

There is no proof of the profits made on the construction of the ferry-boat, but it is highly probable that there were profits, and it may be admitted for the purpose of this question that they reached the figure stated, $100,000. The $40,000 paid for work done could not have been lost to the company unless the transaction was fraudulent or fictitious, which does not appear, but rather the contrary. But, admitting that there is no ground for the general allegation that the defendant and his associates converted these sums to their own use, it is alleged that the defendant was at the date of the transaction complained of a secret partner in the firm of Smith Bros. & Watson, and that whatever the company lost by it he, as a member of that firm, got a share of. Granting for the time being that the defendant was a member of this firm, it does not follow that he was a gainer by any transaction between it and the company, even if the latter was the loser thereby. Taking the plaintiff's contention for true, the defendant was one of five persons constituting the firm of Smith Bros. & Watson, while it appears from the evidence that he was and is the owner of one-fifth of the stock of the company, and was therefore liable to lose on the one hand as much as he could gain on the other. And as to the question of whether the defendant and his co-directors acted wrongfully or even improvidently in consenting to the withdrawal of Smith Bros. & Watson's proposition, it must be remembered that it was done under the advice of eminent counsel, upon the very plausible ground, to say the least of it, that they could not be held thereto; the same not having been accepted by the directors, and the stockholders having no power under the corporation act to transact

any such business. But, however this may be, it is a sufficient answer to this charge, and to any claim the plaintiff may make on the facts involved in it, that he knew all about these matters at and before he executed the contract, and was in no way misinformed or misled by the defendant concerning them. With full knowledge of the facts, he then appears to have regarded the transaction as legal and honest, and if he has since come to a different conclusion, or been advised that the company has a valid claim against the defendant and his "associates" for $400,000 on this account, what possible cause is that for canceling a contract for an interest in a loan to the company?

When the plaintiff executed this contract he must have supposed the company was more or less financially embarrassed, and yet he was not only willing but desirous of taking a considerable interest in a large loan to it; but now that he finds it has a valid claim, of which he was then ignorant, against solvent parties for $400,000, a sum greatly beyond the company's indebtedness, he wishes to be released from his engagement upon the plea that this claim arises out of the previous misconduct of the defendant and his associates, which made this loan necessary.

Neither is the plaintiff entitled to have this contract rescinded by reason of anything that has happened or been omitted since it was executed. The defendant did not undertake absolutely to make this loan to the company or to do so within any specific time; and, in any event, the consent of the company must first be obtained, and the $100,000 already advanced was to be considered a part of it. Doubtless he was bound to make the loan in a reasonable time, the circumstances considered, or return the plaintiff his note and certificate of stock. But the loan has been made in pursuance of the contract, and as soon thereafter as the company would accept it, and give the plaintiff the proper acknowledgment thereof and obligation to repay it. And now whether as a result of this transaction the plaintiff is or may become a non-stockholder in the company, and therefore unable to maintain any suit for relief against these transactions, if wrongful and injurious to the stockholders, is altogether immaterial, so far as this case is concerned. An otherwise valid contract cannot be canceled on any such irrelevant ground or apprehension as this. If the plaintiff, by pledging his stock to the defendant as collateral security, with a blank assignment and power of tansfer, has deprived himself of the right and privilege of a stockholder in the company during the existence of the pledge, he must submit to such deprivation until he is ready to redeem the same by the payment of his note.

On the argument it was maintained on behalf of the defendant that the sale and purchase of the 62½ shares of stock was a material part of the transaction resulting in the contract of March 27th, and therefore no decree of cancellation ought to be made under any circumstances, unless the plaintiff is required to return the $6,250 received

for this stock, on which terms the defendant, waiving all other objections, offers to consent to a rescission of the contract.

The evidence tends strongly to show that the transfer of this stock was a part of the transaction, and a substantial element in the considerations which induced or caused the parties to enter into the contract of March 27th. Seeley, who seems to have been without present means and in debt to Reed, appears to have made his coming to Oregon and taking charge of the company's business, as the latter desired, conditional on the purchase of this stock, while Reed appears to have made his consent to advance money to the company conditional on Seeley's taking charge of its business; and so it would seem that the three things—the purchase, management, and loan—were dependent parts of one whole. But, as in my view of the matter, the plaintiff is not entitled to the relief sought irrespective of this question, I do not further consider it; and if the parties wish to rescind on such terms, they can do so without the aid of the court.

There is no equity in the bill, and it must be dismissed; and it is so ordered.

### NOTE.

#### *Fraudulent Representations.*

Where fraud has been committed, and by it plaintiff has been injured, equity will relieve against it, Singer Manuf'g Co. v. Yarger, 12 Fed. Rep. 487; Elfelt v. Hart, 1 Fed. Rep. 264; Taylor v. Saurman, 1 Atl. Rep. 44; otherwise, however, if no damage is sustained. Dunn v. Remington, 2 N. W. Rep. 230.

Misrepresentations are fraudulent, Lynch v. Mercantile Trust Co., 18 Fed. Rep. 486; Buckner v. Street, 15 Fed. Rep. 365; Chandler v. Childs, 3 N. W. Rep. 297; Cavender v. Roberson, 7 Pac. Rep. 152; even when believed to be true by party making them, Lynch v. Mercantile Trust Co., 18 Fed. Rep. 486; Seeberger v. Hobert, 8 N. W. Rep. 482; and the vendor cannot purge himself of fraud by offering to rescind. Lynch v. Mercantile Trust Co., 18 Fed. Rep. 486.

Fraudulent representations must be material, Hall v. Johnson, 2 N. W. Rep. 55; and must have been relied on. Lynch v. Mercantile Trust Co., 18 Fed. Rep. 486; Seeberger v. Hobert, 8 N. W. Rep. 482. But the purchaser need not suppose every statement made to him literally true in order to entitle him to relief. Heineman v. Steiger, 19 N. W. Rep. 965.

Where the vendor honestly expresses an incorrect opinion as to the amount, quality, and value of the goods he disposes of in a sale of his business, and good-will thereof, and the purchaser sees or knows the property, or has an opportunity to know it, no action for false representations will lie. Collins v. Jackson, 19 N. W. Rep. 947. And mere "dealing talk" in the sale of goods, unless accompanied by some artifice to deceive the purchaser or throw him off his guard, or some concealment of intrinsic defects not easily detected by ordinary care and diligence, does not amount to misrepresentation, Reynolds v. Palmer, 21 Fed. Rep. 433; unless there be false statements in some manner affecting the character, quality, value, or title of the articles sold. Bank of Barnesville v. Yocum, 9 N. W. Rep. 84. But a statement recklessly made without knowledge of its truth is a false statement knowingly made within the settled rule. Cooper v. Schlesinger, 4 Sup. Ct. Rep. 360.

Whether or not omission to communicate known facts will amount to fraudulent representation depends upon the circumstances of the particular case, and the relations of the parties. Britton v. Brewster, 2 Fed. Rep. 160. Where a vendor conceals a material fact, which is substantially the consideration of the contract, and which is peculiarly within his knowledge, it is fraudulent misrepresentation. Dowling v. Lawrence, 16 N. W. Rep. 552.

Fraud is a good defense to an action on a contract, but it is not sufficient to plead fraud in general term. The specific statements and acts relied upon as constituting the fraud must be sets out. Mills v. Collins, 25 N. W. Rep. 109. See VanWeel v. Winston, 6 Sup. Ct. Rep. 22.

Evidence of fraudulent representations must be clear and convincing. Wickham v. Morehouse, 16 Fed. Rep. 324. Where a man sells a business, and the contract of sa e contained a clause including all right to business done by certain agents, evidence that

the seller was willing to engage in the same business with such agents is not proof of fraud in making the contract. Taylor v. Saurman, 1 Atl. Rep. 44. Equity will not presume the ratification of fraudulent contract. Northern Pac. R. Co. v. Kindred, 14 Fed. Rep. 77.

*St. Paul, Minn.*                                                              JAS. M. KERR.