**WESTERN ADDITION COMMUNITY ORGANIZATION**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

The Emporium Capwell Company, Intervenor.

No. 71–1656.

United States Court of Appeals, District of Columbia Circuit.

Argued May 25, 1972.

Decided June 29, 1973.

Kenneth Hecht, San Francisco, Cal., of the bar of the Supreme Court of Cali-fornia, pro hac vice, by special leave of Court, with whom Edward H. Steinman, Santa Clara, Cal., and Lee M. Modjeska, Mill Valley, Cal., were on the brief for petitioner.

Stephen C. Yohay, Atty., National Labor Relations Board of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court with whom Marcel Mallet-Prevost, Asst. Gen. Counsel, and Abigail Cooley Baskir, Atty., National Labor Relations Board, were on the brief for respondent.

George O. Bahrs, San Francisco, Cal., was on the brief for intervenor.

Martin I. Slate, Atty., Equal Employment Opportunity Commission, of the bar of the United States District Court for the District of Columbia, pro hac vice, by special leave of Court with whom Julia P. Cooper, Chief, Appellate Section, Equal Employment Opportunity Commission, was on the brief for Equal Employment Opportunity Commission as amicus curiae urging reversal.

Before ROBINSON and Mac-KINNON, Circuit Judges, and WYZANSKI,* Senior United States District Judge for the District of Massachusetts.

MacKINNON, Circuit Judge:

This case is before us on the petition of the Western Addition Community Organization to review an order [1] of the National Labor Relations Board which dismissed a complaint issued against The Emporium (hereinafter referred to as the Company) for alleged violations of section 8(a)(1) of the National Labor Relations Act, as amended, 29 U.S.C. § 151 et seq. (hereinafter referred to as the Act).[2] The Company is engaged in the operation of a retail department store in San Francisco, and was a member of a multi-employer group, the Re-

---

* Sitting by designation pursuant to Title 28 U.S.C. Section 294(d) (1970).

1. The Board's decision is reported at 192 NLRB No. 19, 77 LRRM 1669 (1971).

2. Section 8(a)(1), 29 U.S.C. § 158(a)(1) provides:

(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title.

tailer's Council, which served as its bargaining agent. The Retailer's Council, was a signatory to a collective bargaining agreement with the Department Store Employees Union (hereinafter the Union) which was the exclusive representative of the Company's employees employed in the stock and marking areas at the store. The applicable collective bargaining agreement contained an anti-discrimination clause,[3] and provided that grievances arising out of the agreement "may be referred to the Adjustment Board," [4] and possibly submitted to arbitration.[5] The agreement also contained no-strike and no-lockout clauses.

In a series of meetings in early April 1968, a group of Company employees including Tom Hawkins and James Joseph Hollins submitted to the Union representatives a list of grievances in which the employees contended that the Company was discriminating against racial minorities. Claiming that racial bias had caused minority employees to be denied promotions, the employees at the outset centered their complaint and specifically charged that employee Russel Young had been denied advancement solely because he was Black. Following these meetings, Union Secretary-Treasurer Walter Johnson designated a Union committee to investigate the allegations, and later that month prepared a detailed report outlining the employees' contentions which "raised . . . the possibility [not solely of Young's com-

plaint but] of *racial discrimination*." [6] (Emphasis added.) Shortly thereafter, Johnson presented his report to the Retailer's Council, where it was agreed that the grievances should be taken directly to the Company. Accordingly, in mid-April Johnson met with the Company labor relations manager and it was agreed that the Company "would look into" the situation and "see what they could do." [7]

In May, a group of ten employees requested an additional meeting with Johnson. The problem of racial discrimination in general and the Russel Young case in particular were again discussed; however, since Young was about to begin his summer vacation, it was agreed that further investigation of the matter should await his return. On about September 3, Johnson again met with the employees, including Hawkins and Hollins, and with representatives of the Fair Employment Practices Committee (FEPC) and the Economic Opportunity Council (EOC), and announced that the Union had considered the problem and had concluded that the Company had been acting discriminatorily. Further, the Union stated that it would demand an Adjustment Board proceeding and would insist upon arbitration if necessary. While acknowledging that arbitration was a time-consuming procedure, Johnson pointed out that the arbitration award, once achieved, would produce a "long lasting effect" which would bene-

---

3. The clause provided:
   Section 21.(E), "No person shall be discriminated against in regard to hire, tenure of employment or job status by reason of race, color, creed, national origin, age or sex."

4. Section 5(B) of the agreement provided:
   Section 5(B), "Any act of any employer, representative of the Union, or any employee that is interfering with the faithful performance of this agreement . . . may be referred to the Adjustment Board for such action as the Adjustment Board deems proper, and permissive within this agreement."

5. The agreement provided that if after considering a submitted issue for one week the Adjustment Board was unable to

reach a settlement, either party could *insist upon binding arbitration*.

6. This report stated:
   Probably the most important matter raised was the possibility of racial discrimination. This is outlawed under the terms of the agreement and certainly again in this day and age should not be a problem. It was the general feeling of almost all present that discrimination is directed against the Negro employees and the more senior employees, senior, that is, in the point of age.

7. Trial Examiner's Decision, appended to the Board's decision 192 NLRB No. 19, (hereinafter cited as TXD) at 3.

fit not only the employees having immediate interest in the problem, but "other people involved in it" as well.[8]

However, the program outlined by Johnson did not satisfy all of the employees. Some of those present expressed "frustration" with the situation and requested that the Union picket the Company's store. Johnson rejected the idea and explained that the Union was bound to seek satisfaction of grievances according to the terms of the collective bargaining agreement. He also stated that though he told the minority employees, including Hawkins and Hollins, that it was his advice that they follow the Adjustment Board and arbitration procedures, he stated that "if they wanted to take any other action they could do it as individuals and do whatever they wanted as individuals."[9] The EOC and FEPC representatives also recommended that the contract procedures be followed.

The next day Johnson wrote the general manager of the Retailer's Council requesting a meeting of the Adjustment Board to resolve the grievances discussed at the previous day's meeting. Johnson told the Council

> We specifically charge the Emporium with violations of [the anti-discrimination clause] of the Agreement between the San Francisco Retailers Council and [the Union]. We have approximately 120 pages of testimony, recorded by a court reporter to substantiate our position.

> We are ready to proceed to immediate arbitration if the Emporium is agreeable.[10]

In response to this letter, on October 16 a meeting was convened of the Adjustment Board.

As the meeting began, Union Agent Williams attempted to present evidence of the Company's practices by questioning employees regarding their individual grievances. However, he was interrupted by Hollins who, speaking for himself and three other employees,[11] read a prepared statement objecting to the prosecution of grievances on an individual basis. Those employees did not want to "speak as individuals," but would act only "as a group."[12] Further, Hollins

---

8. Johnson further testified at the hearing before the Trial Examiner:

    [W]e wanted to process *these grievances* and *we felt that there were problems of discrimination* and it was my own personal feeling that *all the discriminatory acts should be processed and that we ought to follow through and take care of it* (A. 136).

    \*     \*     \*     \*     \*

    [I]t was my feeling certain acts had to take place in order that *everybody* at the Emporium would have an opportunity not only to have a job, but to advance into new positions (A. 137).

    \*     \*     \*     \*     \*

    I specifically requested and pointed out that it is going to take a long time in some of these cases, but that they would not only be helping themselves, but other people involved in it, because we had very strong feelings on the question (A. 136–137). (Emphasis added.)

    References are to the appendix in this case.

9. Append. at 149.

10. TXD at 4.

11. The other employees were identified as Hawkins, Epps and Washington.

12. Hawkins testified:

    The sense was that they [*i. e.,* the Union] wanted to do something, but they wanted to go through the procedure of this retailers counciling [*sic*] and it was going to be individually .when it came about when we were still talking group matters.

    [I]t was individual persons that would say something and on their behalf they would take it into consideration instead of a group matter that we were talking about.

    Q. Was this way of proceeding that the union seemed to want to follow acceptable to you? A. No, it wasn't.

    Q. Why not? A. Because we felt that like if we talked as individuals well, they could only have a few cases, they would satisfy a few. Like Mr. Young, he was the only one that really got something out of the deal, he got a promotion. (Append. at 48–49).

    Hollins testified:

    I said that we didn't want to stay for the meeting that we didn't feel like the

stated that the group "wanted to talk to the President of the Emporium and wouldn't talk to anybody else," since their "main purpose was to talk to the President to try to reach an agreement with him to straighten out the problems and conditions of the Emporium."[13] Then, after refusing to give any testimony regarding individual employees' complaints, the four walked out of the meeting. A second meeting was held of the Adjustment Board two days later, but none of the four attended.[14]

Shortly thereafter, Hollins went to the Company president requesting that they "talk about a situation that [Hollins] felt should be discussed about things that were happening among minority employees at the store."[15] The Company president would not speak to Hollins, but suggested that he talk instead to the Company's personnel director. Hollins refused to talk to the personnel manager, having previously spoken to him about the situation.

Hawkins and Hollins, together with several other employees, called a press conference on October 22 which was attended by representatives of the press, radio and television. The employees stated that the Emporium was engaging in racist conduct by discriminating against racial minorities and that the employees were planning to picket the store. Hollins also read a handbill which the group intended to distribute to the public, and further stated that they "were planning on leafleting and boycotting the store because [they] felt that employees were not being treated fairly, minority employees were not being treated fairly as far as working conditions was [sic] concerned."[16] On the following Saturday, November 2, Hollins, Hawkins and two other employees picketed the store from 9:30 a. m. to 6 p. m., distributing the following handbill to people entering and leaving the store:

BEWARE EMPORIUM SHOPPERS
BOYCOTT IS ON!!!
FOR YEARS AT THE EMPORIUM BLACK, BROWN, YELLOW, AND RED PEOPLE, HAVE WORKED AT THE LOWEST JOBS, AT THE LOWEST LEVELS. TIME AND AGAIN WE HAVE SEEN INTELLIGENT HARD WORKING BROTHERS AND SISTERS DENIED PROMOTIONS AND BASIC RESPECT.
THE EMPORIUM IS A 20TH CENTURY COLONIAL PLANTATION THE BROTHERS AND SISTERS ARE BEING TREATED THE SAME WAY AS OUR BROTHERS ARE BEING TREATED IN THE SLAVE MINES OF SOUTH AFRICA.
WHENEVER THE RACIST PIG AT THE EMPORIUM INJURES OR HARMS A BLACK SISTER OR BROTHER, THEY INJURE AND INSULT ALL BLACK PEOPLE. THE EMPORIUM MUST PAY FOR THESE INSULTS. THEREFORE, WE ENCOURAGE ALL OF OUR PEOPLE TO TAKE THEIR MONEY OUT OF THIS RACIST STORE, UNTIL BLACK PEOPLE HAVE FULL EMPLOYMENT AND ARE PROMOTED JUSTLY THROUGHOUT THE EMPORIUM.
WE WELCOME THE SUPPORT OF OUR BROTHERS AND SISTERS FROM THE CHURCHES, UNION, SORORITIES, FRATERNITIES, SOCIAL CLUBS, AFRO-AMERICAN INSTITUTE, BLACK PANTHER PARTY, W.A.C.O. AND THE POOR PEOPLE'S INSTITUTE.

---

meeting [of the Adjustment Board] was really representing us because they wanted to take our case as an individual thing and we were fighting it as a whole, not an individual case. (Append. at 114).

13. Append. at 13.

14. The record is unclear as to what transpired at this meeting. The record does indicate that two minority employees were promoted by the Company in the fall of 1968 before the November picketing. TXD at 5.

15. Append. at 121.

16. Append. at 82.

While the picketing was in progress, Johnson spoke with Hollins telling him that he did not want to see Hollins fired and suggested that the only way to resolve the matter was through arbitration under the collective bargaining agreement. Hollins responded that they only wanted to talk with the Company president.

On November 7 Hollins and Hawkins were called to the office of the Company's manager of labor relations and given a written warning to refrain from the picketing or possibly be fired.[17] Despite this warning, the two again picketed the store and distributed leaflets the following Saturday. Accordingly, on Monday, November 11, Hollins and Hawkins were fired.[18] The Union subsequently filed a protest with the Retailer's Council challenging the discharges of Hollins and Hawkins, though the Union did not initiate the present action.

On November 19, 1968 the Western Addition Community Organization filed a charge with the N.L.R.B. alleging that the Company had violated section 8(a)(1) of the Act by discharging Hollins and Hawkins. A complaint was issued and a hearing was held on April 8, 1969 before Trial Examiner William E. Spencer. He found that petitioners had engaged in "concerted activity" within the meaning of section 7 of the Act,[19] and that these actions had been based on a good faith belief that the company was actually discriminating against racial minorities.[20] The Trial Examiner next examined whether these concerted activities lost their protection by virtue of the boycott appeal and the invective used against the Company. Though he criticized the language, and found "the potential for injury [to the Company] considerable," [21] *he expressed no conclusion on this issue.* Finally, he examined the issue of whether the concerted activities lost their protection because they were "inconsistent with and disruptive of" the procedures for settling grievances under the collective bargaining agreement to such a degree that it "would not effectuate the policies of the Act to extend its protection to such activities." [22] The Trial Examiner found that the activities were unprotected and recommended that the complaint

17. The warning message to Hollins read:
On October 22, 1968, you issued a public statement at a press conference to which all newspapers, radio, and TV stations were invited. The contents of this statement were substantially the same as these set forth in the sheet attached. This statement was broadcast on Channel 2 on October 22, 1968 and Station KDIA.
On November 2nd you distributed copies of the attached statement to Negro customers and prospective customers, and to other persons passing by in front of The Emporium.
These statements are untrue and are intended to and will, if continued injure the reputation of The Emporium.
There are ample legal remedies to correct any discrimination you may claim to exist. Therefore, we view your activities as a deliberate and unjustified attempt to injure your employer.
This is to inform you that you may be discharged if you repeat any of the above acts or make any similar public statement.
The message given to Hawkins was essentially identical.

18. The discharge slip stated:
You are being discharged today. Distribution of "Boycott Emporium" literature on Saturday, November 9, 1968, in front of the Emporium, 855 Market Street, S. F., pursuant to written warning dated 11/7/68 for similar action on 11/2/68.

19. Section 7, 29 U.S.C. § 157 (1970), provides:
Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

20. TXD at 10.

21. *Id.* at 13.

22. *Id.* at 9.

be dismissed. He reasoned that to protect such conduct

> would seriously undermine the right of employees to bargain collectively through representatives of their own choosing, handicap and prejudice the employee's duly designated representative in its efforts to bring about a durable improvement in working conditions among employees belonging to racial minorities, and place on the Employer an unreasonable burden of attempting to placate self-designated representatives of minority groups while abiding by the terms of a valid bargaining agreement and attempting in good faith to meet whatever demands the bargaining representative put forth under that agreement.[23]

The Board affirmed the rulings of the Trial Examiner, and adopted his findings, conclusions, and recommendations. Two members dissented.[24]

## I

■ Section 7 of the Act protects employees from discharge for engaging in protests against their employer's racially discriminatory practices. N. L. R. B. v. Tanner Motor Livery, Ltd., 349 F.2d 1, 4 (9th Cir. 1965); Mason-Rust, 179 NLRB 434 (1969); Washington State Service Employees State Council No. 18, 188 NLRB No. 141 (1970). Such protests in favor of non-discriminatory working conditions are "concerted activities for the purpose of collective bargaining," within the meaning of that section. Extending the protection of section 7 to such protests is but one aspect of the national labor policy which unequivocally rejects racial discrimination in employment. See, e. g., New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012 (1938).

Another aspect of national labor policy, and certainly a central tenet of the Act's structure, is set out in section 9(a) which provides that the representatives of the bargaining unit "shall be the *exclusive* representatives for all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment" (emphasis added).[25] Recently, in N. L. R. B. v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967) the Supreme Court underscored the purpose of the exclusivity principle enunciated in section 9(a):

> National labor policy has been built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions. The policy therefore extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees. "Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and re-

---

23. *Id.* at 15.

24. Members Jenkins and Brown each filed dissenting opinions.

25. 29 U.S.C. § 159(a) provides in full:
    (a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided,* That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided further,* That the bargaining representative has been given opportunity to be present at such adjustment.

strict the rights of those whom it represents . . . ." Steele v. Louisville & N. R. Co., 323 U.S. 192, 202 [65 S.Ct. 226, 232, 89 L.Ed. 173]. Thus only the union may contract the employee's terms and conditions of employment and provisions for processing his grievances; the union may even bargain away his right to strike during the contract term, and his right to refuse to cross a lawful picket line. The employee may disagree with many of the union decisions but is bound by them. "The majority-rule concept is today unquestionably at the center of our federal labor policy." "The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." Ford Motor Co. v. Huffman, 345 U.S. 330, 338 [73 S.Ct. 681, 686, 97 L.Ed. 1048].

388 U.S. at 180, 87 S.Ct. at 2006 (footnotes omitted). *See also,* J. I. Case v. Labor Board, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944).

■ Similarly, the legislative history of section 9(a) emphasizes that the primary purpose of giving the elected representative the *exclusive* right to represent all members of the bargaining unit in discussions with the employer over working conditions was to prevent the situation where two or more agreements might be negotiated by splinter groups which treated various factions of the bargaining unit unequally. The House Report summarized the purposes of section 9(a) thusly:

The underlying purposes of the majority rule principle are simple and just. As has frequently been stated, collective bargaining is not an end in itself; it is a means to an end, and that end is the making of collective agreements stabilizing employment relations for a period of time, with results advantageous both to the worker and the employer. There cannot be two or more basic agreements applicable to workers in a given unit; this is virtually conceded on all sides. If the employer should fail to give equally advantageous terms to nonmembers of the labor organization negotiating the agreement, there would immediately result a marked increase in the membership of that labor organization. On the other hand, if better terms were given to nonmembers, this would give rise to bitterness and strife, and a wholly unworkable arrangement whereby men performing comparable duties were paid according to different scales of wages and hours. Clearly then, there must be one basic scale, and it must apply to all.

H.R.Rep.No.1147 on S.1958, 74th Cong., 1st Sess. at 20, in II Legislative History of the National Labor Relations Act, 1935 (N.L.R.B. 1949) at 3069. Unequal treatment of members of the same bargaining unit could only produce bitterness, strife, and, ultimately, industrial instability—a prime target at which the Act was aimed. 29 U.S.C. § 151 (1970). Additionally, the cases have noted that the exclusivity of the bargaining representative helps to preserve an orderly procedure for collective bargaining by precluding the employer from bargaining with splinter groups. Medo Photo Corp. v. N. L. R. B., 321 U.S. 678, 685, 64 S.Ct. 830, 88 L.Ed. 1007 (1944).

■ These objectives of section 9(a) have been effectuated by provisions within the Act which restrict employers' conduct and case law which has restricted employees' conduct which interferes with that section. It is an unfair labor practice under sections 8(a)(1) and (5) of the Act for an employer to refuse to bargain with the duly elected union representative or to engage in bargaining with splinter groups. Medo Photo Corp. v. N. L. R. B., *supra.* Similarly, the rights protected by section 7, for employees to engage in concerted activity, have been held to be somewhat limited by section 9(a), though the boundaries of that limitation are by no means defi-

nite. The cases have not produced a uniform approach to determine when concerted activity by a minority of employees loses the protection of section 7 due to a conflict with the exclusivity of the bargaining representative provided by section 9(a). One approach has been to protect minority concerted activity, such as walkouts or picketing, whenever it is not in derogation of the union's position on the matter in question, i. e., when the concerted activity supports the position taken by the union. *See, e. g.,* N. L. R. B. v. R. C. Can Co., 328 F.2d 974 (5th Cir. 1964); Western Contracting Corp. v. N. L. R. B., 322 F.2d 893 (10th Cir. 1963).[26]

Another approach, and now apparently more widely accepted, has been to find the minority concerted activity protected only when it is not disruptive of the concept of orderly collective bargaining, regardless of whether the activity might be deemed to be supportive of the union's position. *See, e. g.,* N. L. R. B. v. Tanner Motor Livery, Ltd., 419 F.2d 216 (9th Cir. 1969); *cf.* N. L. R. B. v. Shop Rite Foods, 430 F.2d 786 (5th Cir. 1970). In *Tanner, supra,* two employees were discharged for picketing their employer in protest over its racially discriminatory hiring practices. The two employees had not attempted to utilize their union representative to remedy the situation, and the union's position on their claims was not known. Though the court agreed that such picketing was concerted activity within section 7, it found that section 9(a) deprived the picketing of the protection to which it otherwise would have been entitled. The court specifically rejected the ra-

tionale of *R. C. Can, supra,* and reasoned that the concept of orderly collective bargaining could only be promoted if employees were held to have "an obligation to go to the union with their desire for non-discriminatory hiring."[27] An analogous position has been taken by a number of courts with respect to "wild cat" strikes which hold that such minority activity is so disruptive of collective bargaining that it can never be protected by section 7. Lee A. Consaul Co. v. N. L. R. B., 469 F.2d 84 (9th Cir. 1972); N. L. R. B. v. Sunbeam Lighting Co., 318 F.2d 661 (7th Cir. 1963); Plasti-Line, Inc. v. N. L. R. B., 278 F.2d 482 (6th Cir. 1960); Harnischfeger Corp. v. N. L. R. B., 207 F.2d 575 (7th Cir. 1953); N. L. R. B. v. Draper Corp., 145 F.2d 199 (4th Cir. 1944).

## II

With this brief discussion of section 9(a) and the cases interpreting the interplay between it and section 7, we examine the application of the exclusivity principle to the minority concerted activities in this case. We conclude that the Board's decision that these concerted activities were not protected by the Act is not supported by substantial evidence in the record and must be reversed. As our discussion below makes clear, we base this conclusion on the distinction between concerted activity involving racially discriminatory employment practices and concerted activity involving other working conditions, an analysis of the exclusivity principle, and the particular facts of this case. We recognize the important role played by the exclusivity principle in collective bargaining

---

26. *See also,* First National Bank of Omaha v. N.L.R.B., 413 F.2d 921, 926 (8th Cir. 1969) (dictum); N.L.R.B. v. Rubber Rolls, Inc., 388 F.2d 71, 73 (3rd Cir. 1967) (dictum); Lee A. Consaul Co., 175 NLRB 547, 549 (1969), enf. denied, 469 F.2d 84 (9th Cir. 1972); Shop Rite Foods, Inc., 171 NLRB 1498, 1510 (1968), modified, 430 F.2d 786 (5th Cir. 1970); San Juan Lumber Co., 154 NLRB 1153, 1163 (1965), enf'd, 367 F.2d 397 (9th Cir. 1966).

The decision in *R. C. Can, supra,* has come increasingly under attack. *See, e. g.,* Lee A. Consaul Co. v. N.L.R.B., 469 F.2d 84, 85 (9th Cir. 1972); N.L.R.B. v. Tanner Motor Livery, Ltd., 419 F.2d 216, 221 (9th Cir. 1969); N.L.R.B. v. Shop Rite Foods, 430 F.2d 786, 790–791 (5th Cir. 1970).

27. 419 F.2d at 221.

and feel that our decision here in no way hampers that role. In part III, *infra*, we note that on remand the Board may consider the issue of disloyalty.

## A. Concerted Activity Involving Racial Discrimination

The right of an employee to racially non-discriminatory treatment is unquestionably a "condition of employment," and as such the negotiation of an anti-discrimination clause in a collective bargaining agreement is within the purview of the exclusive bargaining enunciated in section 9(a). Yet, this right to non-discriminatory treatment differs significantly from other "conditions of employment" which are also the subject of exclusive bargaining, such as pension benefits or seniority rights. The right to be free of racially discriminatory employment practices does not depend upon the presence of an anti-discrimination clause in a collective bargaining agreement, but is firmly rooted in the law. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; United Packinghouse Workers Union v. N. L. R. B., 135 U.S.App.D.C. 111, 416 F.2d 1126, cert. denied, Farmer's Co-op Compress v. United Packinghouse etc., 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969). Even in the absence of such a clause in a collective bargaining agreement, an employer would be equally restrained from engaging in such practices.[28]

Not only does concerted activity involving racial discrimination have a unique status in that the subject matter has independent statutory bases, but section 704(a) of Title VII precludes an employer from discharging employees in retaliation for peaceful picketing of the employer's business in protest of allegedly discriminatory racial practices.[29] *Cf.* Green v. McDonnell-Douglas Corp., 463 F.2d 337, 341 (8th Cir. 1972), aff'd, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Where, as here, both the subject matter of the concerted activity and the right to engage in such activity are safeguarded by legislation, we feel such concerted activity cannot be treated identically with other concerted activity which is not so safeguarded for the purpose of determining whether it so violated section 9(a) as to lose section 7 protection.

Neither the Trial Examiner nor the Board took cognizance of the statutory bases of the rights involved in their evaluation of the undermining effect of these concerted activities to section 9(a).[30] While these activities are the subject of review by the Board only because they are deemed to be "concerted activities" within section 7 and also involving "conditions of employment" within section 9(a), the Board has an obligation in construing the acts which it administers to recognize, and sometimes reconcile, coexisting and perhaps inconsistent policies embodied in other legislation. As the Supreme Court noted in Southern Steamship Co. v. N. L. R.

---

28. Similarly, any analysis of whether concerted activity in protest over racial discrimination in employment was protected *vel non* in light of section 9(a) cannot turn on the fact that the collective bargaining agreement contained an anti-discrimination clause. *See* N.L.R.B. v. Tanner Motor Livery, Ltd., 419 F.2d 216, 221 (9th Cir. 1969). We assume that even in the absence of such a clause, section 7 activity would be equally restrained by section 9(a)—whatever the extent of that limitation might be.

29. 42 U.S.C. § 2000e—3(a)(1970) provides:
    (a) It shall be an unlawful employment practice for an employer to dis-

criminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

30. Both dissenting members criticized the Board for not considering the legislative policies embodied in Title VII. 192 NLRB No. 19 at 17, 23.

B., 316 U.S. 31, 47, 62 S.Ct. 886, 894, 86 L.Ed. 1246 (1942):

> [T]he Board has not been commissioned to effectuate the policies of the Labor Relations Act so single-mindedly that it may wholly ignore other and equally important Congressional objectives. Frequently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another, and it is not too much to demand of an administrative body that it undertake this accommodation without excessive emphasis upon its immediate task.

*See also,* Textile Workers v. Lincoln Mills, 353 U.S. 448, 456–458, 77 S.Ct. 912, 1 L.Ed.2d 972 (1958); *cf.* McLean Trucking Co. v. United States, 321 U.S. 67, 79–80, 64 S.Ct. 370, 88 L.Ed. 544 (1944)[31]; Northern Natural Gas Co. v. F. P. C., 130 U.S.App.D.C. 220, 226–228, 399 F.2d 953, 959–961 (1968). Thus, the Board should have recognized that in light of Title VII, concerted activity involving racial discrimination is quite distinct from other concerted activity.

## B.  Interference with Section 9(a)

As we noted previously,[32] the exclusivity principle enunciated in section 9(a) of the Act was premised on the concept of majority rule. This concept—that what was best for the union was best for the individual—recognized that collective bargaining could not proceed where various factions within the bargaining unit were free to present conflicting or unequal demands to the employer. Subjection of the will of the individual to the will of the majority was the method Congress chose to preserve industrial peace and stability over matters in which individuals would most likely disagree. However, on the issue of whether to tolerate racial discrimination in employment the individuals in a union cannot legally disagree. The law does not give the union an option to tolerate *some* racial discrimination, but declares that *all* racial discrimination in employment is illegal. 42 U.S.C. § 2000e–2 (1970).[33] Therefore, the under-

---

31. In *McLean Trucking Co., supra,* the Supreme Court stated:

> To secure the continuous, close and informed supervision which enforcement of legislative mandates frequently requires, Congress has vested expert administrative bodies such as the Interstate Commerce Commission with broad discretion and has charged them with the duty to execute stated and specific statutory policies. That delegation does not necessarily include either the duty or the authority to execute numerous other laws. Thus, here, the Commission has no power to enforce the Sherman Act as such. It cannot decide definitively whether the transaction contemplated constitutes a restraint of trade or an attempt to monopolize which is forbidden by that Act. The Commission's task is to enforce the Interstate Commerce Act and other legislation which deals specifically with transportation facilities and problems. That legislation constitutes the immediate frame of reference within which the Commission operates; and the policies expressed in it must be the basic determinants of its action.
>
> *But in executing those policies the Commission may be faced with overlapping and at times inconsistent policies embodied in other legislation enacted at different times and with different problems in view. When this is true, it cannot, without more, ignore the latter.* The precise adjustments which it must make, however, will vary from instance to instance depending on the extent to which Congress indicates a desire to have those policies leavened or implemented in the enforcement of the various specific provisions of the legislation with which the Commission is primarily and directly concerned. Cf. National Broadcasting Co. v. United States, 319 U.S. 190 [63 S.Ct. 997, 87 L.Ed. 1344]; New York Central Securities Corp. v. United States, 287 U.S. 12 [53 S.Ct. 45, 77 L.Ed. 138]. 321 U.S. at 79–80, 64 S.Ct. at 376–377 (emphasis added).

32. *See* part I, *supra.*

33. 42 U.S.C. § 2000e—2(a)(1970) provides:

> (a) It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, be-

lying premise of section 9(a) that the will of the individual must be subjected to the will of the majority does not authorize the approval of racially discriminatory employment practices, because the purposes of the minority group and the union in desiring to eradicate racial discrimination in employment cannot be at odds. Accordingly, concerted activity involving racial discrimination involves other factors than the major premise that underlies section 9(a).

While concerted activity over actual racial discrimination differs significantly from concerted activity over other working conditions and does not defeat the underlying premise of section 9(a), nonetheless we recognize that such activity as was engaged in here *does* interfere to a certain extent with the collective bargaining process. In abandoning the grievance procedures and seeking to bargain [34] on their own, the picketers here rendered essentially ineffective the method of remedying grievances chosen by their collective bargaining representative and provided by the collective bargaining agreement.[35] We cannot agree with the Board, however, that this limited interference *alone* is sufficient to remove these concerted activities here from the protection of the Act.

First, we note that petitioners did not immediately proceed to settle their dispute with the Company over racial discrimination on their own, but utilized the procedures provided by the collective bargaining agreement for several months. Thus, the situation was quite different, and less disruptive of collective bargaining, than the one confronted by the Ninth Circuit in *Tanner, supra,* where no attempt had been made to utilize the union representative or the contract procedures before engaging in minority concerted activity. We agree with *Tanner* that even when racial issues are at stake, one should be required to submit such disputes first to the union before one resorts to minority concerted activity.[36] Without such a requirement, parties aggrieved by racially discriminatory employment practices would have little incentive to use the grievance procedures in the agreement, and certainly national labor policy favors the use of grievance-arbitration procedures to settle labor disputes, *see,* *e. g.,* Boys Markets Inc. v. Retail Clerks Union, 398 U.S. 235, 242–243, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), even when they involve racial discrimination. Though the exact role of grievance-arbitration procedures in enforcing rights created by Title VII is presently the subject of considerable dispute, *see*

cause of such individual's race, color, religion, sex, or national origin; or

  (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

34. Petitioners argue that they only wanted to "talk" with the Company's president and "discuss" the situation. They dispute the Trial Examiner's finding that Hawkins and Hollins activities were "no mere presentation of a grievance, but nothing short of a demand that [the Company] bargain with the picketing employees for the entire group of minority employees." TXD at 14. However, we can see no reason to disturb this finding.

35. We can find nothing in the collective bargaining agreement that would have prevented the Union from proceeding on a class basis, representing all minority employees, but the method of procedure would have still required essentially the presentation of evidence with respect to individual employees.

36. We note that an employee has not been required to resort to contract grievance procedures, however, before maintaining a Title VII action. Parmer v. Nat'l Cash Register Co., 346 F.Supp. 1043, 1049 (S.D.Ohio 1972); Evans v. Local Union 2127, 313 F.Supp. 1354, 1358 (N.D.Ga.1969); Bremer v. St. Louis S. W. R. R., 310 F.Supp. 1333, 1337–1338 (E.D.Mo.1969); King v. Georgia Power, 295 F.Supp. 943 (N.D.Ga.1968).

Meltzer, Labor Arbitration and Overlapping and Conflicting Remedies for Employment Discrimination, 39 U.Chi.L. Rev. 30 (1971), we think grievance-arbitration procedures can play an important role in remedying racial discrimination in employment and should be encouraged. *See, e. g.*, Hutchings v. United States Industries, 428 F.2d 303, 309 (5th Cir. 1970).[37]

Second, we find it significant that the Union and the petitioners were *not* working at cross-purposes, but were both attempting to eradicate racially discriminatory employment practices.[38] There was no disruption of orderly collective bargaining in the sense that a minority of employees were not attempting here to speak for the majority as in the case where a minority group engages in a "wildcat" strike during company-union negotiations in an attempt to express a rejection of a company offer. *See, e. g.*, N. L. R. B. v. Sunbeam Lighting Co., 318 F.2d 661 (7th Cir. 1963). Third, we note that after pursuing their grievances on an individual basis for several months, petitioners asked their elected representative to proceed on a "group" basis,[39] *i. e.*, to represent all minority employees affected by the alleged discrimination. The Union declined to change its pending complaint to proceed on a "group" basis. At this point petitioners abandoned the pending grievance procedure which had been initiated on their behalf and engaged in concerted

activity allegedly on behalf of all minority employees. We think these facts indicate that though the immediate adjustment board proceedings were disrupted, this disruption cannot wholly destroy the protection afforded these employees by section 7, especially in light of the express protection mandated by Title VII and the limited interference with section 9(a).

■■■■■ There is nothing in the record before us to indicate that the Union's decision to remedy the charges of discrimination by proceeding on an individual rather than a group or class basis was made in bad faith.[40] The Union may well have thought it had chosen the most efficacious method to handle the charges, and it may have done so. Nonetheless, it might be that these charges could have been better handled on a group or class basis. Had the Union's decision to process only individual grievances been made to delay the ultimate eradication of discrimination, or been motivated by similar bad faith considerations, clearly it would have breached its duty of fair representation of all of its members. *See, e. g.*, Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); Steele v. Louisville & Nashville R.R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Tunstall v. Brotherhood of Locomotive Firemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944). Under such circumstances a union's decision to proceed on

37. *See also*, Gould, Labor Arbitration of Grievances Involving Racial Discrimination, 118 U.Pa.L.Rev. 40 (1969).

38. Indeed, if the Union were not working to eradicate racially discriminatory employment practices, it would not only be violating its statutory duty of fair representation, Vaca v. Sipes, 386 U.S. 171, 182, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), but also committing an unfair labor practice, *see, e. g.*, Local 12, United Rubber Workers v. N.L.R.B., 368 F.2d 12 (5th Cir. 1966), cert. denied, 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967).

39. *See* note 12, *supra*.

40. The record contains a number of uncontradicted references to the fact that the

union was proceeding on an individual basis. However, it also appears that the union charged the employer with "racial discrimination" and alleged broad violations in the April 11, 1968 Report (General Counsel Ex. 7, Tr. 190–194). Thus, regardless of the nomenclature used, it may well be that the union was bringing all the charges that were supported by evidence. Whether this constituted proceeding on an individual basis or some other broader basis is impossible for us to determine. We recognize that a "group" action must necessarily depend upon a number of individual cases. The important consideration is not how the proceeding might be characterized but whether *the union is proceeding against all* discrimination.

an individual basis could not, in our view, prevent a minority from attempting to proceed by means of another alternative method. Yet, even where there might be no bad faith on the part of the union, we recognize that the method chosen by a union might not be the most efficacious or expedient. For example, the union might be vigorously processing individual grievances before an adjustment board, while it would be more efficient and thus preferable for it to be attempting to engage in collective bargaining negotiations with the employer for all minorities to eliminate all the discriminatory employment practices. In such a case, we do not think the method or means chosen by the union should preclude a minority group who has reasonable grounds for believing that the union is not proceeding against all discrimination from attempting to assert its claim of racial discrimination in a manner which it considers would be more successful. Otherwise, as Member Jenkins observed in dissent, a union "would [be] permit[ted] . . . to control the scope, direction, pace and degree of racial discrimination." [41] We agree that the eradication of racial discrimination in employment cannot be subjected to such a restriction. Thus, the Labor Board should inquire, in cases such as this, whether the union was actually remedying the discrimination to the *fullest extent possible, by the most expedient and efficacious means.* Where the union's efforts fall short of this high standard, the minority group's concerted activities cannot lose its section 7 protection.

The Trial Examiner reasoned that orderly collective bargaining would be undermined by protecting this concerted activity because it would impose upon the Company "an unreasonable burden" of having to bargain with appellants while, at the same time, dealing with the Union representative in the grievance procedure.[42] Certainly collec-

tive bargaining must be orderly in the sense that no stable, meaningful agreement can be reached where various factions are free to make conflicting demands upon an employer. The avoidance of such a state of affairs, as we have noted, was the prime motivation behind the exclusivity principle of section 9(a).[43] We can see nothing in that principle, however, which indicates that it was intended to be used as a shield to protect an employer from the "burden" of having to deal with two groups on the same subject. We cannot agree that any inconvenience which the Company might experience in being required to bargain with the minority here while still participating in the grievance procedures justifies withdrawing section 7 protection from these concerted activities.

### III

On remand the Board may consider the issue of whether the picketing of these employees, considering the language used, was so disloyal to their employer as to remove them from the protection of section 7. N. L. R. B. v. Local Union No. 1229 (Jefferson Standard), 346 U.S. 464, 74 S.Ct. 172, 98 L. Ed. 195 (1953). Neither the Board nor the Trial Examiner decided this issue, though the latter discussed it at considerable length.[44] While we do not express any opinion on the merits of this issue, we note that in considering it on remand the Board should closely examine the facts to ensure that neither racial discrimination nor adversity toward these concerted activities motivated the Company in its decision to discharge the employees. As the Supreme Court observed in *Jefferson Standard, supra*:

> The legal principle that insubordination, disobedience or disloyalty is adequate cause for discharge is plain enough. The difficulty arises in determining whether, in fact, the discharges are made because of such a separable cause or because of some

---

41. 192 NLRB No. 19, slip op. at 11.

42. TXD at 15.

43. *See* pp. 13–15, *supra.*

44. TXD at 11–13.

other concerted activities engaged in for the purpose of collective bargaining or other mutual aid or protection which may not be adequate cause for discharge.

346 U.S. at 475, 74 S.Ct. at 178. Such a factual determination is especially important here because any discharge which was racially motivated would be an unfair labor practice, United Packinghouse Workers Union v. N. L. R. B., 135 U.S.App.D.C. 111, 416 F.2d 1126, cert. denied, Farmer's Co-op Compress v. United Packinghouse etc., 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969); moreover any discharge due solely to the employer's objection against lawfully protesting his allegedly discriminatory employment practices would be unlawful. N. L. R. B. v. Tanner Motor Livery, Ltd., 349 F.2d 1 (9th Cir. 1965).[45]

For these reasons the decision and order of the Board are reversed and remanded to the Board for further proceedings consistent with the opinion.

Judgment accordingly.

WYZANSKI, Senior District Judge (dissenting):

I regret that my view of the facts and the law differs in some respects from my brethren's excellent opinion. As I see it, we have enough to decide unequivocally the question whether the NLRB properly concluded that The Emporium Capwell Co. did not violate Section 8(a)(1) of the National Labor Relations Act when it discharged employees James Joseph Hollins and Tom Hawkins.

This case is before the Court on the petition of the Western Addition Community Organization (hereinafter referred to as the "Petitioner") to review an order of the National Labor Relations Board, issued July 22, 1971, pursu-

---

45. Title VII also recognizes that an employee may be properly discharged for engaging in disloyal conduct, if that is the real cause of the discharge. However, the discharge would be unlawful, and the employee subject to reinstatement, if it were due to the fact that the employee had opposed certain employment practices made illegal by Title VII. 42 U.S.C.A. § 2000e—5(g) (1972 Supp.) provides:
(g) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged *for any reason other than discrimination* on account of race, color, religion, sex, or national origin or in violation of section 2000e—3(a) of this title. (Emphasis added.) Section 2000e—3(a) provides:
(a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

ant to Section 10(c) of the National Labor Relations Act, as amended (61 Stat. 136, 73 Stat. 519, 29 U.S.C., Sec. 151 et seq.), dismissing a complaint issued against The Emporium Capwell Co. (hereinafter referred to as the "Company"). The Board's Decision and Order is reported at 192 NLRB No. 19. This Court has jurisdiction under Section 10(f) of the Act.

Tom Hawkins and James Joseph Hollins were employees of the Company from June 1966, and November 1967, respectively, until their discharge on November 11, 1968. The Company is engaged in the operation of a retail department store at 835 Market Street, San Francisco, California. At all material times the Company was a member of a multi-employer group, the Retailer's Council, which served as its bargaining agent, and, as such, was signatory to a collective bargaining agreement with the Department Store Employees Union (hereinafter the "Union") which was the exclusive representative of the Company's employees employed in the stock and marking areas at the store. The applicable collective bargaining agreement provided, inter alia:

> Section 21(E), "No person shall be discriminated against in regard to hire, tenure of employment or job status by reason of race, color, creed, national origin, age or sex.

> \* \* \* \* \* \*

> Section 5(B), "Any act of any employer, representative of the Union or any employee that is interfering with the faithful performance of this agreement . . . may be referred to the Adjustment Board for such action as the Adjustment Board deems proper and permissive within this agreement."

The agreement also provided that if, after considering a submitted issue for one week, the Board was unable to reach a settlement, either party could insist upon binding arbitration. Also, the agreement contained no-strike and no-lockout clauses.

In a series of meetings in early April 1968, a group of Company employees, including Hawkins and Hollins, submitted to Union representatives a list of grievances in which the employees contended that the Company was discriminating against racial minorities. Claiming that racial bias had caused minority employees to be denied promotions, the employees specifically charged that employee Russel Young had been denied advancement solely because he is black. Following these meetings, Union Secretary-Treasurer Walter Johnson designated a union committee to investigate the allegations, and later that month prepared a detailed report outlining the employees' contentions which stated, *inter alia*:

> Probably, the most important matter raised was the possibility of racial discrimination. This is outlawed under the terms of the agreement and certainly again in this day and age should not be a problem. It was the general feeling of almost all present that discrimination is directed against the Negro employees and the more senior employees, senior, that is, in the point of age.

Shortly thereafter, Johnson presented his report to the Retailers Council, where it was agreed that the grievances should be taken directly to the Company. Accordingly, in mid-April, Johnson met with Company labor relations manager Paul Ehrenfried and it was agreed that the Company "would look into" the situation and "see what they could do."

In May, a group of ten employees requested an additional meeting with Johnson. The problem of racial discrimination in general and the Russel Young case in particular were again discussed; however, since Young was about to begin his summer vacation, it was agreed that further investigation of the matter should await his return. On about September 3, Johnson again met with the employees, including Hawkins and Hollins, and with representatives of the Fair Employment Practices Committee

("FEPC") and the local Economic Opportunity Council ("EOC"), and announced that the Union had considered the problem and had concluded that the Company had been acting discriminatorily, and that, in accordance with its contract with the Retailers Council, the Union would demand an Adjustment Board proceeding and would insist upon arbitration if necessary. While acknowledging that arbitration was a time-consuming procedure, Johnson pointed out that the arbitration award, once achieved, would produce a "long lasting effect" which would benefit not only the employees having immediate interest in the problem, but "other people involved in it" as well. As he explained at the hearing:

> [W]e wanted to process these grievances and we felt that there were problems of discrimination and it was my own personal feeling that all the discriminatory acts should be processed and that we ought to follow through and take care of it.

> \* \* \* \* \* \*

> [I]t was my feeling certain acts had to take place in order that everybody at the Emporium would have an opportunity not only to have a job, but to advance into new positions.

> \* \* \* \* \* \*

> I specifically requested and pointed out that it is going to take a long time in some of these cases, but that they would not only be helping themselves, but other people involved in it, because we had very strong feelings on the question.

> \* \* \* \* \* \*

> I came to the conclusion after the meeting we had in April that there was a serious situation that developed and it had to be taken care of.

However, the program outlined by Johnson did not satisfy all of the employees; thus, some of those present expressed "frustration" with the situation and proposed that the Union picket the Company's store. Johnson rejected the idea and in an exchange with Hollins explained that the Union was bound to seek satisfaction of grievances according to the terms of its contract and thus could not engage in "dramatic" protests such as boycotts. Johnson further stated that while individual employees "could take whatever action they wanted so long as it was legal," it was the Union's advice that they follow an "orderly legal procedure." The EOC and FEPC representatives supported Johnson's position.

The next day, Johnson wrote Vincent Brown, general manager of the Retailer's Council, requesting a meeting of the Adjustment Board to resolve the grievances discussed at the previous day's meeting, asserting, *inter alia*:

> We specifically charge the Emporium with violations of Section 5(B) and 21(E) of the Agreement between the San Francisco Retailers Council and [the Union]. We have approximately 120 pages of testimony, recorded by a court reporter to substantiate our position.

> We are ready to proceed to immediate arbitration if the Emporium is ready.

> \* \* \* \* \* \*

In response to this letter, a meeting of the Adjustment Board was convened on October 16. Accordingly, the Union in consultation with counsel prepared its position for presentation to the Board.

As the meeting began, Union Agent Williams attempted to present evidence of the Company's practices by questioning employees regarding their individual grievances. However, he was interrupted by Hollins who, acting as spokesman for himself and employees Hawkins, Epps and Washington, read a prepared statement objecting to the prosecution of grievances on an individual rather than a group basis and stating that these four employees would not "speak as individuals," but would act only "as a group." Further, Hollins stated that the group "wanted to talk to the President of the Emporium and wouldn't talk to anybody else," since their "main purpose was to talk to the President to try

to reach an agreement with him to straighten out the problems and conditions of the Emporium." Then, after refusing to give any testimony regarding individual employees' complaints, Hollins, Hawkins, Epps, and Washington walked out of the meeting.

A second meeting of the Adjustment Board was held on October 18, but none of the group of four attended. The record is unclear as to what transpired at the meeting; however, Hawkins did acknowledge in his testimony at the hearing in this case that through the Union's intervention, Russel Young was promoted to the position of First Assistant Manager, and Fata, another employee, was also promoted to a supervisory position.

Thereafter, in accordance with the group's stated intentions, Hollins went to Company President Batchelder insisting that they "talk about a situation that [Hollins] felt should be discussed about things that were happening among minority employees at the store." Batchelder would not speak with Hollins but suggested that Hollins discuss the situation with Henderson, the Company's personnel director. Hollins refused.

On October 22, Hawkins and Hollins, together with several other employees, called a press conference at the Sun-Reporter Building in San Francisco which was attended by representatives of the press, radio and television. The employees stated that the Emporium was engaging in racist conduct by discriminating against racial minorities and that the employees were planning to picket the store. Hollins also read the contents of a handbill which the group intended to distribute to the public (see below) and stated that their objective was "to try to talk to the top management to get better conditions for the Emporium."

Then, on the following Saturday, November 2, employees Hollins, Hawkins, Epps and Washington picketed the store from 9:30 a.m. to 6 p.m., distributing the following handbill to people entering or leaving the store:

BEWARE EMPORIUM SHOPPERS

BOYCOTT IS ON!!!

FOR YEARS AT THE EMPORIUM BLACK, BROWN, YELLOW, AND RED PEOPLE, HAVE WORKED AT THE LOWEST JOBS, AT THE LOWEST LEVELS. TIME AND AGAIN WE HAVE SEEN INTELLIGENT HARD WORKING BROTHERS AND SISTERS DENIED PROMOTIONS AND BASIC RESPECT.

THE EMPORIUM IS A 20TH CENTURY COLONIAL PLANTATION THE BROTHERS AND SISTERS ARE BEING TREATED THE SAME WAY AS OUR BROTHERS ARE BEING TREATED IN THE SLAVE MINES OF SOUTH AFRICA.

WHENEVER THE RACIST PIG AT THE EMPORIUM INJURES OR HARMS A BLACK SISTER OR BROTHER, THEY INJURE AND INSULT ALL BLACK PEOPLE. THE EMPORIUM MUST PAY FOR THESE INSULTS. THEREFORE, WE ENCOURAGE ALL OF OUR PEOPLE TO TAKE THEIR MONEY OUT OF THIS RACIST STORE UNTIL BLACK PEOPLE HAVE FULL EMPLOYMENT AND ARE PROMOTED JUSTLY THROUGHOUT THE EMPORIUM.

WE WELCOME THE SUPPORT OF OUR BROTHERS AND SISTERS FROM THE CHURCHES, UNION, SORORITIES, FRATERNITIES, SOCIAL CLUBS, AFRO-AMERICAN INSTITUTE, BLACK PANTHER PARTY, W.A. C.O. AND THE POOR PEOPLE'S INSTITUTE.

While the picketing was in progress, Johnson told Hollins that he did not want to see him fired and that the only way to resolve the matter was through arbitration. Hollins ignored Johnson's suggestion and again stated that "the only one they wanted to talk to was Mr. Batchelder."

On November 7, Hollins and Hawkins were called to the office of Paul Ehrenfried, manager of labor relations, and given a formal written warning which

stated as follows with respect to the press conference of October 22 and the handbill of November 2:

These statements are untrue and are intended to and will if continued injure the reputation of the Emporium. There are ample legal remedies to correct any discrimination you may claim to exist. Therefore, we view your activities as a deliberate and unjustified attempt to injure your employer.

This is to inform you that you may be discharged if you repeat any of the above acts or make any similar public statements.

Nevertheless, on the following Saturday, November 9, Hollins and Hawkins again picketed the Emporium and distributed leaflets substantially identical with those distributed the previous week.

Accordingly, on Monday, November 11, Hollins and Hawkins were called to Ehrenfried's office and were discharged. Each was given a discharge slip which bore the notation:

You are being discharged today. Distribution of "Boycott Emporium" literature on Saturday, November 9, 1968, in front of the Emporium, 855 Market Street, S.F., pursuant to written warning dated 11/7/68 for similar action on 11/2/68.

The Union subsequently filed a protest with the Retailer's Council on the discharge of Hawkins and Hollins.

November 19, 1968 Western Addition Community Organization, acting for Hawkins and Hollins, filed with the NLRB a charge that Emporium had violated NLR Act by discharging them for engaging in statutorily-protected concerted activities, and that those discharges constituted unfair labor practices within the meaning of Section 8(a)(1) of the Act. The NLRB issued a complaint. After hearing before an NLRB Trial Examiner, he recommended dismissal of the complaint. On review, the Board dismissed the complaint, solely on the ground that the activities of Hollins and Hawkins were not protected because they were in derogation of the right of exclusivity of representation conferred upon the union by Sections 8 and 9 of the Act. That dismissal is the subject of the petition filed in this court by Western Addition Community Organization.

Essentially the question here presented is whether after the employees in a collective bargaining unit have selected a representative in accordance with § 9 of the NLR Act those in a minority are free to bargain with their employer concerning class conditions of alleged racial discrimination within that unit. As the ensuing discussion indicates, attempts to avoid the direct thrust of that issue seem to be, in at least this case, exercises in futility or postponement. The essential question cannot be properly evaded or escaped by pretending that here we are dealing with individual grievances of single employees rather than working conditions of a group of employees, or that here we have a minority of employees who are not acting in derogation of the authority of their union representative. What this case requires this court to face is whether, in the light of the special aspects of the problem of potential racial discrimination, to which both the generalities of the United States Constitution and the specifics of such Civil Rights Acts as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., are addressed, there is created an exception to the usual rule of exclusivity of bargaining rights conferred by the NLR Act upon a union selected by a majority of employees in an appropriate unit. This initially presents a matter of statutory construction of the NLR Act, although, if that is not resolved favorably to the petitioner, there lurks in the background a possible question as to whether insofar as it purports to give the representative selected by a majority a power to stand athwart a minority's claim to the right to seek racial non-discriminatory conditions, the NLR Act violates the Fifth, Thirteenth, and Fifteenth Amendments to the United States Constitution, inasmuch as then the Act might be regarded as perpetuat-

ing the consequences of slavery, buttressing racial discrimination, and denying due process of law.

In the case at bar the facts as viewed by the NLRB make it plain that Hollins and Hawkins sought to present to the management of Emporium not their personal grievances, such as their individual failure to be accorded their due under the collective bargaining agreement, or such as the adjustment of some wholly individual complaint. What those two men wanted was a change in management's policies in promoting, hiring, and otherwise treating that class of workers within the unit who were not white in color. Cf. NLRB v. Tanner Motor Livery, Ltd., 9th Cir., 1969, 419 F. 216, 218; Brown v. Sterling Aluminum Products Corp., 8th Cir., 1966, 365 F.2d 651, 657. There could not be a plainer instance of an attempt to bargain respecting working conditions, as distinguished from an adjustment of grievances.

Nor can it validly be claimed that on this record Hollins and Hawkins were not acting in derogation of the union representative selected by a majority, but rather were acting to supplement, support, and make more explicit the application, of the bargaining contract theretofore negotiated by that union representative. To be sure, the contract, theretofore negotiated, provided that the employer should not discriminate racially. However, fairly construed, that glittering generality was, according to the contract, to be vindicated, if necessary, by a procedure of specific complaints made by the union representative and by him presented through the grievance and arbitral machinery. This the union clearly saw, and its officials were themselves quite unwilling to press for any broad assault on the employer to concede on some group basis that it should adopt a different policy of promoting or hiring colored persons. While there is a shade of ambiguity as to the union's attitude toward having such an assault made by Hollins and Hawkins, the union neither welcomed nor encouraged the steps Hollins and Hawkins took to get the employer to change its policies. It may be that the record does not show that the union interposed a firm veto. Yet we are not so unsophisticated as not to appreciate why this evidence is not and probably never would be available. We recognize that the union could have reasons which it might not choose to proclaim from the housetops why it did not want anything approaching what it might regard as a policy of employment based on affirmative measures to achieve racial balance. Whether Hollins and Hawkins had as ultimate goals affirmative quotas for blacks, or some method of achieving in the Emporium store a racial balance corresponding to the racial balance provided by judicial decrees as a remedy in certain public employment and in certain school cases, it is no secret that what was here sought would be in derogation of the union in at least two ways. In the most obvious way it would represent a political victory for Hollins and Hawkins which would certainly not add to, and almost surely would detract from, the political appeal of the present union officers at the next election of representatives by the employees in the relevant unit; and which, long before the election, would detract from the union's glamor. More important, if Hollins and Hawkins succeed in their efforts to have the employer change its policies some whites now employed and others who might be employed will be potential losers. If a black man is promoted or hired, it is inevitable that a white will not be promoted or hired for the same job. Thus Hollins and Hawkins are acting in derogation of the union, its contract, and many of its members.

Yet this case is not to be disposed of merely by uncovering its bare bones and ripping off the veils in which it has been wrapped, that is, the pretense that this is not an effort to change working conditions in the unit, and the further pretense that this effort is not in derogation of the representative selected by

a majority in accordance with Section 9 of the NLR Act. We must recognize that this is not, except most superficially, analogous to a case wherein a minority within an appropriate unit seeks, without the consent of the representative selected by a majority, to get different wages, (See Archibald Cox, The Right To Engage In Concerted Activities, (1951) 26 Indiana Law Journal 320), or seeks to reach agreement more quickly than the representative has done, (Cf. NLRB v. Draper Corp., 4th Cir., 1944, 145 F.2d 199, 156 A.L.R. 989; NLRB v. Sunset Minerals, Inc., 9th Cir., 1954, 211 F.2d 224,) or seeks the same results with the acquiescence, expressed or implied, of the representative selected by the majority, (Cf. NLRB v. R. C. Can Co., 5th Cir., 1964, 328 F.2d 974–978–979), or, let us say, purely hypothetically, seeks to get better working conditions for members of a fraternal organization, or quicker promotion for workers who have been graduated from institutions of advanced education, or even claims that skilled workers in the unit ought to be differently treated from unskilled workers. See William B. Gould, The Status of Unauthorized And 'Wildcat' Strikes Under The National Labor Relations Act (1967) 52 Cornell L.Q. 672, 686.

What this case involves is a racial issue. Racial issues in our society are, because of the United States Constitution, because of the history, traditions and aspirations of our people, and because of the legislation of Congress, most particularly Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., in quite a different category from other issues presented by a minority in a unit which has selected a representative in accordance with § 9 of the Act.

A first, and by no means trivial, reason why the employer, the union, the NLR Board, and we are required to treat differently a complaint as to a working condition with racial character is that, as shown by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and by cases such as Griggs v. Duke Power Co., 1971, 401 U. S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158, it is part of our national policy, declared in Acts of Congress, not merely that an employer shall avoid the prejudice inherent in discriminating negatively by refusing to hire or promote black persons, but that an employer shall take affirmative steps to assure that black persons have equality of opportunity for employment and promotions. See Castro v. Beecher, D.Mass.1971, 334 F.Supp. 930, aff'd. with modifications by 1st Cir., 1972, 459 F.2d 725, and particularly the opinions of the District Court on remand, April 15, 1973. The NLR Act contemplates that the NLRB and all others concerned with the Act shall enforce that policy together with the policy of non-discrimination against employees on account of their legitimate union activities. This is the fair implication of Southern Steamship Co. v. NLRB, 1942, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246.

There is a second and more subtle reason why a racial complaint must be looked upon differently from the run-of-the-mill complaints made by minorities as to everything from wages to drinking fountains. When the minority consists of non-whites who seek for themselves what they regard as equality of opportunity, it is to be expected that their position is, if not hostile to, or at least uncongenial to, certainly not fully shared by, a majority of whites in the same unit. Even if we assume that the whites are tolerant, nay generous, their short-term interest is in conflict with the short-term interest of the non-whites. Nothing—except perhaps a philosophy founded upon long-term interests—can eliminate that basic conflict. Hence it is essentially a denial of justice to allow the white majority to have the power to preclude the non-whites from dealing directly with the employer on racial issues, whether or not this is in dis-

paragement of the rights of the union representative. See John Rawls, A Theory of Justice, Harvard University Press (1971) pp. 228–234; Sir Isaiah Berlin, Two Concepts of Liberty, Oxford University Clarendon Press (1958), pp. 9–14, 48–57.

This inevitable conflict makes it necessary either to construe legislation so as to avoid an obvious injustice, or, in the last resort, if such construction is not permissible, to face up to the ultimate Constitutional question in the spirit so perceptively adumbrated in the now classic fourth footnote in United States v. Carolene Products Co., 1938, 304 U.S. 144, 152–153, 58 S.Ct. 778, 82 L.Ed. 1234.

Fortunately, here there is no insuperable difficulty in construing the NLR Act to permit a minority, (despite the previous selection by a majority of a representative of the unit in which the minority is employed, and despite a collective bargain executed by that representative and the employer) to bargain directly with the employer in regard to racial issues which affect that minority in a way different from the way they affect the majority. A meticulous reading of the history of the NLR Act makes this point evident. When, as Solicitor General, the Honorable Stanley Reed argued before the Supreme Court that the NLR Act was constitutional, he sought to explain the object of giving exclusivity to the representative. See 75th Cong., 1st Sess., Senate Document No. 52, Arguments In The Cases Arising Under The Railway Labor Act And The National Labor Relations Act Before The Supreme Court of The United States, February 8–11, 1937, pp. 37–38. He had made the same point, somewhat more precisely, earlier in the week in footnote 35a in the brief he had filed in Virginian Railway Co. v. System Federation No. 40, 1937, 300 U.S. 515, 536–537, 57 S.Ct. 592, 81 L.Ed. 789, a companion case involving the cognate Railway Labor Act. What Mr. Reed's brief

said, Mr. Justice Stone's opinion in Virginian Railway case, just cited, incorporated with great specificity into the Railway Labor Act. See 300 U.S. 548, footnote 6, 57 S.Ct. 592, and Mr. Chief Justice Hughes' opinion in National Labor Relations Board v. Jones & Laughlin Co., 1937, 301 U.S. 1, 44, 57 S.Ct. 615, 81 L.Ed. 893, incorporated with somewhat more generality into the National Labor Relations Act.

What is undeniable (as the discerning opinion of Circuit Judge John R. Brown in NLRB v. R. C. Can Co., 1964, 5 Cir., 328 F.2d 974, 979, joined in by Circuit Judge Elmer Tuttle, emphasizes, and as Vaca v. Sipes, 1967, 386 U.S. 171, 87 S. Ct. 903, 17 L.Ed. 842 and Note Individual Control Over Personal Grievances under Vaca v. Sipes, 77 Yale L.J. 559 (1968) seem to recognize) is that the draftsmen of the NLR Act, those who championed it in argument before the Supreme Court, and that court itself had their focus on the chaos that would occur, the breakdown of the union's authority, the unfortunate predicament of an harassed employer, and the likely breach of industrial peace which would occur if every dissident group of workers in an appropriate unit was free to negotiate all the terms of its own working conditions with the employer. However, no one associated with the original Wagner Act cases or the legislative debates preceding the adoption of the NLR Act had his attention called to a racial or kindred term of employment where it was *inevitable* that the interests of the representative and of the majority would be adverse to a statutorily—, not to say, constitutionally—, protected claim of a minority or dissident group or individual. See Donnelly v. United Fruit Co., 1963, 40 N.J. 61, 190 A.2d 825; Hain, Black Workers Versus White Unions etc., 16 Wayne L.Rev. 37 (1969).

Verbally, and, from one set of premises, one may say "logically" as well, the reasoning which precludes a minority from bargaining about wages or normal

working conditions also precludes the minority from bargaining about racial discrimination. But that argument proceeds from an implied premise that Congress when it used the all-inclusive language of exclusivity set forth in Sections 8 and 9 of the NLR Act really meant to be all-inclusive. The plain fact of the matter is that there is not a shred of evidence to show that the draftsmen of the Act, its sponsors, the legislators who enacted it, the President who signed it, the lawyers who argued for it, or the Justices who sustained it ever contemplated the issue presented in the case at bar: i. e., whether the NLR Act gives to a white majority the power to foreclose a non-white minority from presenting to their employer those special issues which arise with respect to the employment of non-whites. It cannot fairly be supposed that by implication, or by the use of general language of an admittedly comprehensive nature, Congress intended to deny the non-whites what thoughtful persons must concede is elementary justice.

TO LEAVE NON-WHITES AT THE MERCY OF WHITES IN THE PRESENTATION OF NON-WHITE CLAIMS WHICH ARE ADMITTEDLY ADVERSE TO THE WHITES WOULD BE A MOCKERY OF DEMOCRACY. SUPPRESSION, INTENTIONAL OR OTHERWISE, OF THE PRESENTATION OF NON-WHITE CLAIMS CANNOT BE TOLERATED IN OUR SOCIETY EVEN IF, WHICH IS PROBABLY AT LEAST THE SHORT-TERM CONSEQUENCE, THE RESULT IS THAT INDUSTRIAL PEACE IS TEMPORARILY ADVERSELY AFFECTED. IN PRESENTING NON-WHITE ISSUES NON-WHITES CANNOT, AGAINST THEIR WILL, BE RELEGATED TO WHITE SPOKESMEN, MIMICKING BLACK MEN. THE DAY OF THE MINSTREL SHOW IS OVER.

Inasmuch as the NLR Act lends itself to a construction which avoids the denial of elementary justice it is unnecessary for this court to consider whether if the statute did deny the non-white minority the right to present issues which have a non-white hue, the NLR Act as applied to the minority would be repugnant to the Fifth, Thirteenth, or Fifteenth Amendments to the United States Constitution.

Some miscellaneous points should be answered before concluding.

There is, of course, no question that the issues tendered by Hawkins and Hollins related to "working conditions" as that term is used in Sections 7, 8, 9, and other parts of the NLR Act.

Therefore, unless the "exclusivity" doctrine stood in the way, Hawkins and Hollins had a statutorily-protected right to picket in order to present their claim with respect to alleged discrimination against non-whites. This was indeed specifically recognized by the Court of Appeals for the Ninth Circuit in the first stage of NLRB v. Tanner Motor Ltd., 9th Cir., 1965, 349 F.2d 1, although, of course, in the second stage of the same case, NLRB v. Tanner Motor Ltd., 9th Cir., 1969, 419 F.2d 216, the Ninth Circuit has reached a conclusion diametrically opposed to the one set forth in this opinion.

In this case there is not properly before us as a Court of Appeals any question as to whether the language, signs, and like utterances by Hawkins, Hollins, and their associates were such as to deprive them of a statutory privilege against discriminatory action by their employer. The NLRB itself, (though not its trial examiner), refrained from any comment on those utterances. The board, in short, did not refuse to issue a complaint against Emporium on any ground related to the utterances of Hawkins and Hollins. We are, therefore, not called upon to decide whether we think such utterances fall within the doctrines of NLRB v. Local Union No.

1229, 1953, 346 U.S. 464, 472, 74 S.Ct. 172, 98 L.Ed. 195 and Patterson Sargent Co., 1956, 115 NLRB 1627, 38 LRRM 1134.

Certainly the Board was warranted in not placing petitioner beyond the pale of legal relief merely because the vulgar language and the want of "company loyalty" of Hawkins and Hollins, and their disregard of the truth were offensive. See Dobbs Houses v. NLRB, 5th Cir., 1963, 325 F.2d 531, and Crown Central Petroleum Corp. v. NLRB, 5th Cir., 1970, 430 F.2d 724, 731.

For judges to make a ruling upon the effect of language and conduct which in its opinion the NLRB did not characterize and rule be either permissible or impermissible would be to arrogate unto ourselves a preliminary fact-finding and law-determining function which Congress has entrusted to the Board and not to our non-expert hands. Nothing said herein, however, is to be construed as indicating approval of the vulgarities and exaggeration in the utterance of Hawkins, Hollins and their fellows. To be sure, those who use such Billingsgate are not on that account to be denied legal relief. Nonetheless, it is fitting for the court to remind those represented by petitioner that their interests, as well as the interests of the employer and, more important, of democratic society favor rational discussion, and not abusive intemperate name-calling. Those who seek an understanding tolerance would do well to practice it.

In my view, the NLRB's order should be set aside, and the Board be directed to take further proceedings in conformity with this opinion. I see nothing to be gained by a broad as distinguished from a narrow, directory remand unequivocally commanding the NLRB to grant the relief sought by the complaint. I see no possible way of avoiding the head-on challenge to the exclusivity principle which is involved in the incontrovertible facts. Justice delayed is justice denied.